MORRISSEY ET AL. *v.* BREWER, WARDEN, ET AL.

No. 71–5103.  Argued April 11, 1972—Decided June 29, 1972

BURGER, C. J., delivered the opinion of the Court, in which STEW-
ART, WHITE, BLACKMUN, POWELL, and REHNQUIST, JJ., joined.
BRENNAN, J., filed an opinion concurring in the result, in which
MARSHALL, J., joined, *post,* p. 490. DOUGLAS, J., filed an opinion
dissenting in part, *post,* p. 491.

*W. Don Brittin, Jr.,* by appointment of the Court, 404
U. S. 1036, argued the cause and filed briefs for petitioners.

*Lawrence S. Seuferer,* Assistant Attorney General of
Iowa, argued the cause for respondents. With him on
the brief was *Richard C. Turner,* Attorney General.

Briefs of *amici curiae* urging reversal were filed by
*William W. Falsgraf* and *Robert J. Kutak* for the Ameri-
can Bar Association; by *Melvin L. Wulf, Herman
Schwartz,* and *Robert Plotkin* for the American Civil
Liberties Union; and by *Craig Eldon Pinkus* for James H.
Russell.

MR. CHIEF JUSTICE BURGER delivered the opinion
of the Court.

We granted certiorari in this case to determine whether
the Due Process Clause of the Fourteenth Amendment
requires that a State afford an individual some oppor-
tunity to be heard prior to revoking his parole.

Petitioner Morrissey was convicted of false drawing
or uttering of checks in 1967 pursuant to his guilty plea,
and was sentenced to not more than seven years' con-
finement. He was paroled from the Iowa State Peni-
tentiary in June 1968. Seven months later, at the di-
rection of his parole officer, he was arrested in his home
town as a parole violator and incarcerated in the county
jail. One week later, after review of the parole officer's
written report, the Iowa Board of Parole revoked Mor-

rissey's parole, and he was returned to the penitentiary located about 100 miles from his home. Petitioner asserts he received no hearing prior to revocation of his parole.

The parole officer's report on which the Board of Parole acted shows that petitioner's parole was revoked on the basis of information that he had violated the conditions of parole by buying a car under an assumed name and operating it without permission, giving false statements to police concerning his address and insurance company after a minor accident, obtaining credit under an assumed name, and failing to report his place of residence to his parole officer. The report states that the officer interviewed Morrissey, and that he could not explain why he did not contact his parole officer despite his effort to excuse this on the ground that he had been sick. Further, the report asserts that Morrissey admitted buying the car and obtaining credit under an assumed name, and also admitted being involved in the accident. The parole officer recommended that his parole be revoked because of "his continual violating of his parole rules."

The situation as to petitioner Booher is much the same. Pursuant to his guilty plea, Booher was convicted of forgery in 1966 and sentenced to a maximum term of 10 years. He was paroled November 14, 1968. In August 1969, at his parole officer's direction, he was arrested in his home town for a violation of his parole and confined in the county jail several miles away. On September 13, 1969, on the basis of a written report by his parole officer, the Iowa Board of Parole revoked Booher's parole and Booher was recommitted to the state penitentiary, located about 250 miles from his home, to complete service of his sentence. Petitioner asserts he received no hearing prior to revocation of his parole.

The parole officer's report with respect to Booher recommended that his parole be revoked because he had violated the territorial restrictions of his parole without consent, had obtained a driver's license under an assumed name, operated a motor vehicle without permission, and had violated the employment condition of his parole by failing to keep himself in gainful employment. The report stated that the officer had interviewed Booher and that he had acknowledged to the parole officer that he had left the specified territorial limits and had operated the car and had obtained a license under an assumed name "knowing that it was wrong." The report further noted that Booher had stated that he had not found employment because he could not find work that would pay him what he wanted—he stated he would not work for $2.25 to $2.75 per hour—and that he had left the area to get work in another city.

After exhausting state remedies, both petitioners filed habeas corpus petitions in the United States District Court for the Southern District of Iowa alleging that they had been denied due process because their paroles had been revoked without a hearing. The State responded by arguing that no hearing was required. The District Court held on the basis of controlling authority that the State's failure to accord a hearing prior to parole revocation did not violate due process. On appeal, the two cases were consolidated.

The Court of Appeals, dividing 4 to 3, held that due process does not require a hearing. The majority recognized that the traditional view of parole as a privilege rather than a vested right is no longer dispositive as to whether due process is applicable; however, on a balancing of the competing interests involved, it concluded that no hearing is required. The court reasoned that parole is only "a correctional device authorizing service of sentence outside the penitentiary," 443 F. 2d

942, 947; the parolee is still "in custody." Accordingly, the Court of Appeals was of the view that prison officials must have large discretion in making revocation determinations, and that courts should retain their traditional reluctance to interfere with disciplinary matters properly under the control of state prison authorities. The majority expressed the view that "non-legal, non-adversary considerations" were often the determinative factors in making a parole revocation decision. It expressed concern that if adversary hearings were required for parole revocation, "with the full panoply of rights accorded in criminal proceedings," the function of the parole board as "an administrative body acting in the role of *parens patriae* would be aborted," *id.*, at 949, and the board would be more reluctant to grant parole in the first instance—an apprehension that would not be without some basis if the choice were between a full-scale adversary proceeding or no hearing at all. Additionally, the majority reasoned that the parolee has no statutory right to remain on parole. Iowa law provides that a parolee may be returned to the institution at any time. Our holding in *Mempa* v. *Rhay*, 389 U. S. 128 (1967), was distinguished on the ground that it involved deferred sentencing upon probation revocation, and thus involved a stage of the criminal proceeding, whereas parole revocation was not a stage in the criminal proceeding. The Court of Appeals' decision was consistent with many other decisions on parole revocations.

In their brief in this Court, respondents assert for the first time that petitioners were in fact granted hearings after they were returned to the penitentiary. More generally, respondents say that within two months after the Board revokes an individual's parole and orders him returned to the penitentiary, on the basis of the parole officer's written report it grants the individual a hearing before the Board. At that time, the Board goes over "each of

the alleged parole violations with the returnee, and he is given an opportunity to orally present his side of the story to the Board." If the returnee denies the report, it is the practice of the Board to conduct a further investigation before making a final determination either affirming the initial revocation, modifying it, or reversing it.[1] Respondents assert that Morrissey, whose parole was revoked on January 31, 1969, was granted a hearing before the Board on February 12, 1969. Booher's parole was revoked on September 13, 1969, and he was granted a hearing on October 14, 1969. At these hearings, respondents tell us—in the briefs—both Morrissey and Booher admitted the violations alleged in the parole violation reports.

Nothing in the record supplied to this Court indicates that respondent claimed, either in the District Court or the Court of Appeals, that petitioners had received hearings promptly after their paroles were revoked, or that in such hearing they admitted the violations; that information comes to us only in the respondents' brief here. Further, even the assertions that respondents make here are not based on any public record but on interviews with two of the members of the parole board. In the interview relied on to show that petitioners admitted their violations, the board member did not assert he could remember that both Morrissey and Booher admitted the parole violations with which they were charged. He stated only that, according to his memory, in the previous several years all but three returnees had admitted commission of the parole infractions al-

---

[1] The hearing required by due process, as defined herein, must be accorded *before* the effective decision. See *Armstrong* v. *Manzo*, 380 U. S. 545 (1965). Petitioners assert here that only one of the 540 revocations ordered most recently by the Iowa Parole Board was reversed after hearing, Petitioners' Reply Brief 7, suggesting that the hearing may not objectively evaluate the revocation decision.

leged and that neither of the petitioners was among the three who denied them.

We must therefore treat this case in the posture and on the record respondents elected to rely on in the District Court and the Court of Appeals. If the facts are otherwise, respondents may make a showing in the District Court that petitioners in fact have admitted the violations charged before a neutral officer.

## I

Before reaching the issue of whether due process applies to the parole system, it is important to recall the function of parole in the correctional process.

During the past 60 years, the practice of releasing prisoners on parole before the end of their sentences has become an integral part of the penological system. Note, Parole Revocation in the Federal System, 56 Geo. L. J. 705 (1968). Rather than being an *ad hoc* exercise of clemency, parole is an established variation on imprisonment of convicted criminals. Its purpose is to help individuals reintegrate into society as constructive individuals as soon as they are able, without being confined for the full term of the sentence imposed. It also serves to alleviate the costs to society of keeping an individual in prison.[2] The essence of parole is release from prison, before the completion of sentence, on the condition that the prisoner abide by certain rules during the balance of the sentence. Under some systems, parole is granted automatically after the service of a certain portion of a prison term. Under others, parole is granted by the discretionary action of a board, which evaluates an array of information about a pris-

[2] See Warren, Probation in the Federal System of Criminal Justice, 19 Fed. Prob. 3 (Sept. 1955); Annual Report, Ohio Adult Parole Authority 1964/65, pp. 13–14; Note, Parole: A Critique of Its Legal Foundations and Conditions, 38 N. Y. U. L. Rev. 702, 705–707 (1963).

oner and makes a prediction whether he is ready to reintegrate into society.

To accomplish the purpose of parole, those who are allowed to leave prison early are subjected to specified conditions for the duration of their terms. These conditions restrict their activities substantially beyond the ordinary restrictions imposed by law on an individual citizen. Typically, parolees are forbidden to use liquor or to have associations or correspondence with certain categories of undesirable persons. Typically, also they must seek permission from their parole officers before engaging in specified activities, such as changing employment or living quarters, marrying, acquiring or operating a motor vehicle, traveling outside the community, and incurring substantial indebtedness. Additionally, parolees must regularly report to the parole officer to whom they are assigned and sometimes they must make periodic written reports of their activities. Arluke, A Summary of Parole Rules—Thirteen Years Later, 15 Crime & Delin. 267, 272–273 (1969).

The parole officers are part of the administrative system designed to assist parolees and to offer them guidance. The conditions of parole serve a dual purpose; they prohibit, either absolutely or conditionally, behavior that is deemed dangerous to the restoration of the individual into normal society. And through the requirement of reporting to the parole officer and seeking guidance and permission before doing many things, the officer is provided with information about the parolee and an opportunity to advise him. The combination puts the parole officer into the position in which he can try to guide the parolee into constructive development.[3]

The enforcement leverage that supports the parole conditions derives from the authority to return the pa-

---

[3] Note, Observations on the Administration of Parole, 79 Yale L. J. 698, 699–700 (1970).

rolee to prison to serve out the balance of his sentence if he fails to abide by the rules. In practice, not every violation of parole conditions automatically leads to revocation. Typically, a parolee will be counseled to abide by the conditions of parole, and the parole officer ordinarily does not take steps to have parole revoked unless he thinks that the violations are serious and continuing so as to indicate that the parolee is not adjusting properly and cannot be counted on to avoid antisocial activity.[4] The broad discretion accorded the parole officer is also inherent in some of the quite vague conditions, such as the typical requirement that the parolee avoid "undesirable" associations or correspondence. Cf. *Arciniega* v. *Freeman,* 404 U. S. 4 (1971). Yet revocation of parole is not an unusual phenomenon, affecting only a few parolees. It has been estimated that 35%–45% of all parolees are subjected to revocation and return to prison.[5] Sometimes revocation occurs when the parolee is accused of another crime; it is often preferred to a new prosecution because of the procedural ease of recommitting the individual on the basis of a lesser showing by the State.[6]

Implicit in the system's concern with parole violations is the notion that the parolee is entitled to retain his liberty as long as he substantially abides by the conditions of his parole. The first step in a revocation decision thus involves a wholly retrospective factual question: whether the parolee has in fact acted in violation of one or more conditions of his parole. Only if it is determined that

---

[4] *Ibid.*

[5] President's Commission on Law Enforcement and Administration of Justice, Task Force Report: Corrections 62 (1967). · The substantial revocation rate indicates that parole administrators often deliberately err on the side of granting parole in borderline cases.

[6] See *Morrissey* v. *Brewer,* 443 F. 2d 942, at 953–954, n. 5 (CA8 1971) (Lay, J., dissenting); *Rose* v. *Haskins,* 388 F. 2d 91, 104 (CA6 1968) (Celebrezze, J., dissenting).

the parolee did violate the conditions does the second question arise: should the parolee be recommitted to prison or should other steps be taken to protect society and improve chances of rehabilitation? The first step is relatively simple; the second is more complex. The second question involves the application of expertise by the parole authority in making a prediction as to the ability of the individual to live in society without committing antisocial acts. This part of the decision, too, depends on facts, and therefore it is important for the board to know not only that some violation was committed but also to know accurately how many and how serious the violations were. Yet this second step, deciding what to do about the violation once it is identified, is not purely factual but also predictive and discretionary.

If a parolee is returned to prison, he usually receives no credit for the time "served" on parole.[7] Thus, the returnee may face a potential of substantial imprisonment.

## II

We begin with the proposition that the revocation of parole is not part of a criminal prosecution and thus the full panoply of rights due a defendant in such a proceeding does not apply to parole revocations. Cf. *Mempa* v. *Rhay,* 389 U. S. 128 (1967). Parole arises after the end of the criminal prosecution, including imposition of sentence. Supervision is not directly by the court but by an administrative agency, which is sometimes an arm of the court and sometimes of the executive. Revocation deprives an individual, not of the absolute liberty to which every citizen is entitled, but only of the conditional liberty properly dependent on observance of special parole restrictions.

---

[7] Arluke, A Summary of Parole Rules—Thirteen Years Later, 15 Crime and Delinquency 267, 271 (1969); Note, Parole Revocation in the Federal System, 56 Geo. L. J. 705, 733 (1968).

We turn, therefore, to the question whether the requirements of due process in general apply to parole revocations. As MR. JUSTICE BLACKMUN has written recently, "this Court now has rejected the concept that constitutional rights turn upon whether a governmental benefit is characterized as a 'right' or as a 'privilege.'" *Graham* v. *Richardson,* 403 U. S. 365, 374 (1971). Whether any procedural protections are due depends on the extent to which an individual will be "condemned to suffer grievous loss." *Joint Anti-Fascist Refugee Committee* v. *McGrath,* 341 U. S. 123, 168 (1951) (Frankfurter, J., concurring), quoted in *Goldberg* v. *Kelly,* 397 U. S. 254, 263 (1970). The question is not merely the "weight" of the individual's interest, but whether the nature of the interest is one within the contemplation of the "liberty or property" language of the Fourteenth Amendment. *Fuentes* v. *Shevin,* 407 U. S. 67 (1972). Once it is determined that due process applies, the question remains what process is due. It has been said so often by this Court and others as not to require citation of authority that due process is flexible and calls for such procedural protections as the particular situation demands. "[C]onsideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action." *Cafeteria & Restaurant Workers Union* v. *McElroy,* 367 U. S. 886, 895 (1961). To say that the concept of due process is flexible does not mean that judges are at large to apply it to any and all relationships. Its flexibility is in its scope once it has been determined that some process is due; it is a recognition that not all situations calling for procedural safeguards call for the same kind of procedure.

We turn to an examination of the nature of the interest

of the parolee in his continued liberty. The liberty of a parolee enables him to do a wide range of things open to persons who have never been convicted of any crime. The parolee has been released from prison based on an evaluation that he shows reasonable promise of being able to return to society and function as a responsible, self-reliant person. Subject to the conditions of his parole, he can be gainfully employed and is free to be with family and friends and to form the other enduring attachments of normal life. Though the State properly subjects him to many restrictions not applicable to other citizens, his condition is very different from that of confinement in a prison.[8] He may have been on parole for a number of years and may be living a relatively normal life at the time he is faced with revocation.[9] The parolee has relied on at least an implicit promise that parole will be revoked only if he fails to live up to the parole conditions. In many cases, the parolee faces lengthy incarceration if his parole is revoked.

We see, therefore, that the liberty of a parolee, although indeterminate, includes many of the core values of unqualified liberty and its termination inflicts a "grievous loss" on the parolee and often on others. It is hardly useful any longer to try to deal with this problem in terms of whether the parolee's liberty is a "right" or a "privilege." By whatever name, the liberty is valuable and must be seen as within the protection of the Fourteenth Amendment. Its termination calls for some orderly process, however informal.

---

[8] "It is not sophistic to attach greater importance to a person's justifiable reliance in maintaining his conditional freedom so long as he abides by the conditions of his release, than to his mere anticipation or hope of freedom." *United States ex rel. Bey* v. *Connecticut Board of Parole,* 443 F. 2d 1079, 1086 (CA2 1971).

[9] See, *e. g., Murray* v. *Page,* 429 F. 2d 1359 (CA10 1970) (parole revoked after eight years; 15 years remaining on original term).

Turning to the question what process is due, we find that the State's interests are several. The State has found the parolee guilty of a crime against the people. That finding justifies imposing extensive restrictions on the individual's liberty. Release of the parolee before the end of his prison sentence is made with the recognition that with many prisoners there is a risk that they will not be able to live in society without committing additional antisocial acts. Given the previous conviction and the proper imposition of conditions, the State has an overwhelming interest in being able to return the individual to imprisonment without the burden of a new adversary criminal trial if in fact he has failed to abide by the conditions of his parole.

Yet, the State has no interest in revoking parole without some informal procedural guarantees. Although the parolee is often formally described as being "in custody," the argument cannot even be made here that summary treatment is necessary as it may be with respect to controlling a large group of potentially disruptive prisoners in actual custody. Nor are we persuaded by the argument that revocation is so totally a discretionary matter that some form of hearing would be administratively intolerable. A simple factual hearing will not interfere with the exercise of discretion. Serious studies have suggested that fair treatment on parole revocation will not result in fewer grants of parole.[10]

This discretionary aspect of the revocation decision need not be reached unless there is first an appropriate determination that the individual has in fact breached

---

[10] Sklar, Law and Practice in Probation and Parole Revocation Hearings, 55 J. Crim. L. C. & P. S. 175, 194 (1964) (no decrease in Michigan, which grants extensive rights); Rose v. Haskins, 388 F. 2d 91, 102 n. 16 (CA6 1968) (Celebrezze, J., dissenting) (cost of imprisonment so much greater than parole system that procedural requirements will not change economic motivation).

the conditions of parole. The parolee is not the only one who has a stake in his conditional liberty. Society has a stake in whatever may be the chance of restoring him to normal and useful life within the law. Society thus has an interest in not having parole revoked because of erroneous information or because of an erroneous evaluation of the need to revoke parole, given the breach of parole conditions. See *People ex rel. Menechino* v. *Warden,* 27 N. Y. 2d 376, 379, and n. 2, 267 N. E. 2d 238, 239, and n. 2 (1971) (parole board had less than full picture of facts). And society has a further interest in treating the parolee with basic fairness: fair treatment in parole revocations will enhance the chance of rehabilitation by avoiding reactions to arbitrariness.[11]

Given these factors, most States have recognized that there is no interest on the part of the State in revoking parole without any procedural guarantees at all.[12] What is needed is an informal hearing structured to assure that the finding of a parole violation will be based on verified facts and that the exercise of discretion will be informed by an accurate knowledge of the parolee's behavior.

## III

We now turn to the nature of the process that is due, bearing in mind that the interest of both State and

---

[11] See President's Commission on Law Enforcement and Administration of Justice, Task Force Report: Corrections 83, 88 (1967).

[12] See n. 15, *infra.* As one state court has written, "Before such a determination or finding can be made it appears that the principles of fundamental justice and fairness would afford the parolee a reasonable opportunity to explain away the accusation of a parole violation. [The parolee] . . . is entitled to a conditional liberty and possessed of a right which can be forfeited only by reason of a breach of the conditions of the grant." *Chase* v. *Page,* 456 P. 2d 590, 594 (Okla. Crim. App. 1969).

parolee will be furthered by an effective but informal hearing. In analyzing what is due, we see two important stages in the typical process of parole revocation.

(a) *Arrest of Parolee and Preliminary Hearing.* The first stage occurs when the parolee is arrested and detained, usually at the direction of his parole officer. The second occurs when parole is formally revoked. There is typically a substantial time lag between the arrest and the eventual determination by the parole board whether parole should be revoked. Additionally, it may be that the parolee is arrested at a place distant from the state institution, to which he may be returned before the final decision is made concerning revocation. Given these factors, due process would seem to require that some minimal inquiry be conducted at or reasonably near the place of the alleged parole violation or arrest and as promptly as convenient after arrest while information is fresh and sources are available. Cf. *Hyser* v. *Reed,* 115 U. S. App. D. C. 254, 318 F. 2d 225 (1963). Such an inquiry should be seen as in the nature of a "preliminary hearing" to determine whether there is probable cause or reasonable ground to believe that the arrested parolee has committed acts that would constitute a violation of parole conditions. Cf. *Goldberg* v. *Kelly,* 397 U. S., at 267–271.

In our view, due process requires that after the arrest, the determination that reasonable ground exists for revocation of parole should be made by someone not directly involved in the case. It would be unfair to assume that the supervising parole officer does not conduct an interview with the parolee to confront him with the reasons for revocation before he recommends an arrest. It would also be unfair to assume that the parole officer bears hostility against the parolee that destroys his neutrality; realistically the failure of the parolee is in a sense a

failure for his supervising officer.[13] However, we need make no assumptions one way or the other to conclude that there should be an uninvolved person to make this preliminary evaluation of the basis for believing the conditions of parole have been violated. The officer directly involved in making recommendations cannot always have complete objectivity in evaluating them.[14] *Goldberg* v. *Kelly* found it unnecessary to impugn the motives of the caseworker to find a need for an independent decisionmaker to examine the initial decision.

This independent officer need not be a judicial officer. The granting and revocation of parole are matters traditionally handled by administrative officers. In *Goldberg,* the Court pointedly did not require that the hearing on termination of benefits be conducted by a judicial officer or even before the traditional "neutral and detached" officer; it required only that the hearing be conducted by some person *other* than one initially dealing with the case. It will be sufficient, therefore, in the parole revocation context, if an evaluation of whether reasonable cause exists to believe that conditions of parole have been violated is made by someone such as a parole officer other than the one who has made the report of parole violations or has recommended revocation. A State could certainly choose some other independent decisionmaker to perform this preliminary function.

With respect to the preliminary hearing before this officer, the parolee should be given notice that the hear-

---

[13] Note, Observations on the Administration of Parole, 79 Yale L. J. 698, 704–706 (1970) (parole officers in Connecticut adopt role model of social worker rather than an adjunct of police, and exhibit a lack of punitive orientation).

[14] This is not an issue limited to bad motivation. "Parole agents are human, and it is possible that friction between the agent and parolee may have influenced the agent's judgment." 4 Attorney General's Survey on Release Procedures: Parole 246 (1939).

ing will take place and that its purpose is to determine whether there is probable cause to believe he has committed a parole violation. The notice should state what parole violations have been alleged. At the hearing the parolee may appear and speak in his own behalf; he may bring letters, documents, or individuals who can give relevant information to the hearing officer. On request of the parolee, a person who has given adverse information on which parole revocation is to be based is to be made available for questioning in his presence. However, if the hearing officer determines that an informant would be subjected to risk of harm if his identity were disclosed, he need not be subjected to confrontation and cross-examination.

The hearing officer shall have the duty of making a summary, or digest, of what occurs at the hearing in terms of the responses of the parolee and the substance of the documents or evidence given in support of parole revocation and of the parolee's position. Based on the information before him, the officer should determine whether there is probable cause to hold the parolee for the final decision of the parole board on revocation. Such a determination would be sufficient to warrant the parolee's continued detention and return to the state correctional institution pending the final decision. As in *Goldberg,* "the decision maker should state the reasons for his determination and indicate the evidence he relied on . . ." but it should be remembered that this is not a final determination calling for "formal findings of fact and conclusions of law." 397 U. S., at 271. No interest would be served by formalism in this process; informality will not lessen the utility of this inquiry in reducing the risk of error.

(b) *The Revocation Hearing.* There must also be an opportunity for a hearing, if it is desired by the parolee, prior to the final decision on revocation by the parole

authority. This hearing must be the basis for more than determining probable cause; it must lead to a final evaluation of any contested relevant facts and consideration of whether the facts as determined warrant revocation. The parolee must have an opportunity to be heard and to show, if he can, that he did not violate the conditions, or, if he did, that circumstances in mitigation suggest that the violation does not warrant revocation. The revocation hearing must be tendered within a reasonable time after the parolee is taken into custody. A lapse of two months, as respondents suggest occurs in some cases, would not appear to be unreasonable.

We cannot write a code of procedure; that is the responsibility of each State. Most States have done so by legislation, others by judicial decision usually on due process grounds.[15] Our task is limited to deciding the

---

[15] Very few States provide no hearing at all in parole revocations. Thirty States provide in their statutes that a parolee shall receive some type of hearing. See Ala. Code, Tit. 42, § 12 (1959); Alaska Stat. § 33.15.220 (1962); Ariz. Rev. Stat. Ann. § 31–417 (1956); Ark. Stat. Ann. § 43–2810 (Supp. 1971); Del. Code Ann., Tit. 11, § 4352 (Supp. 1970); Fla. Stat. Ann. § 947.23 (1) (Supp. 1972); Ga. Code Ann. § 77–519 (Supp. 1971); Haw. Rev. Stat. § 353–66 (1968); Idaho Code §§ 20–229, 20–229A (Supp. 1971); Ill. Ann. Stat., c. 108, §§ 204 (e), 207 (Supp. 1972); Ind. Ann. Stat. § 13–1611 (Supp. 1972); Kan. Stat. Ann. § 22–3721 (1971); Ky. Rev. Stat. Ann. § 439.330 (1) (e) (1962); La. Rev. Stat. Ann. § 15:574.9 (Supp. 1972); Me. Rev. Stat. Ann., Tit. 34, § 1675 (Supp. 1970–1971); Md. Ann. Code, Art. 41, § 117 (1971); Mich. Comp. Laws § 791.240a, Mich. Stat. Ann. § 28.2310 (1) (Supp. 1972); Miss. Code Ann. § 4004–13 (1956); Mo. Ann. Stat. § 549.265 (Supp. 1971); Mont. Rev. Codes Ann. §§ 94–9838, 94–9835 (1969); N. H. Rev. Stat. Ann. § 607:46 (1955); N. M. Stat. Ann. § 41–17–28 (1972); N. Y. Correc. Law § 212 subd. 7 (Supp. 1971); N. D. Cent. Code § 12–59–15 (Supp. 1971); Pa. Stat. Ann., Tit. 61, § 331.21a (b) (1964); Tenn. Code Ann. § 40–3619 (1955); Tex. Code Crim. Proc., Art. 42.12, § 22 (1966); Vt. Stat. Ann., Tit. 28, § 1081 (b) (1970); Wash. Rev. Code §§ 9.95.120 through 9.95.126 (Supp. 1971); W. Va. Code Ann. § 62–12–19 (1966). Decisions of state and federal courts have re-

minimum requirements of due process. They include (a) written notice of the claimed violations of parole; (b) disclosure to the parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a "neutral and detached" hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers; and (f) a written statement by the factfinders as to the evidence relied on and reasons for revoking parole. We emphasize there is no thought to equate this second stage of parole revocation to a criminal prosecution in any sense. It is a narrow inquiry; the process should be flexible enough to consider evidence including letters, affidavits, and other material that would not be admissible in an adversary criminal trial.

We do not reach or decide the question whether the parolee is entitled to the assistance of retained counsel or to appointed counsel if he is indigent.[16]

---

quired a number of other States to provide hearings. See *Hutchison* v. *Patterson,* 267 F. Supp. 433 (Colo. 1967) (approving parole board regulations); *United States ex rel. Bey* v. *Connecticut State Board of Parole,* 443 F. 2d 1079 (CA2 1971) (requiring counsel to be appointed for revocation hearings); *State* v. *Holmes,* 109 N. J. Super. 180, 262 A. 2d 725 (1970); *Chase* v. *Page,* 456 P. 2d 590 (Okla. Crim. App. 1969); *Bearden* v. *South Carolina,* 443 F. 2d 1090 (CA4 1971); *Baine* v. *Beckstead,* 10 Utah 2d 4, 347 P. 2d 554 (1959); *Goolsby* v. *Gagnon,* 322 F. Supp. 460 (ED Wis. 1971). A number of States are affected by no legal requirement to grant any kind of hearing.

[16] The Model Penal Code § 305.15 (1) (Proposed Official Draft 1962) provides that "[t]he institutional parole staff shall render reasonable aid to the parolee in preparation for the hearing and he shall be permitted to advise with his own legal counsel."

We have no thought to create an inflexible structure for parole revocation procedures. The few basic requirements set out above, which are applicable to future revocations of parole, should not impose a great burden on any State's parole system. Control over the required proceedings by the hearing officers can assure that delaying tactics and other abuses sometimes present in the traditional adversary trial situation do not occur. Obviously a parolee cannot relitigate issues determined against him in other forums, as in the situation presented when the revocation is based on conviction of another crime.

In the peculiar posture of this case, given the absence of an adequate record, we conclude the ends of justice will be best served by remanding the case to the Court of Appeals for its return of the two consolidated cases to the District Court with directions to make findings on the procedures actually followed by the Parole Board in these two revocations. If it is determined that petitioners admitted parole violations to the Parole Board, as respondents contend, and if those violations are found to be reasonable grounds for revoking parole under state standards, that would end the matter. If the procedures followed by the Parole Board are found to meet the standards laid down in this opinion that, too, would dispose of the due process claims for these cases.

We reverse and remand to the Court of Appeals for further proceedings consistent with this opinion.

*Reversed and remanded.*

MR. JUSTICE BRENNAN, with whom MR. JUSTICE MARSHALL joins, concurring in the result.

I agree that a parole may not be revoked, consistently with the Due Process Clause, unless the parolee is afforded, first, a preliminary hearing at the time of arrest to determine whether there is probable cause to believe

that he has violated his parole conditions and, second, a final hearing within a reasonable time to determine whether he has, in fact, violated those conditions and whether his parole should be revoked. For each hearing the parolee is entitled to notice of the violations alleged and the evidence against him, opportunity to be heard in person and to present witnesses and documentary evidence, and the right to confront and cross-examine adverse witnesses, unless it is specifically found that a witness would thereby be exposed to a significant risk of harm. Moreover, in each case the decisionmaker must be impartial, there must be some record of the proceedings, and the decisionmaker's conclusions must be set forth in written form indicating both the evidence and the reasons relied upon. Because the Due Process Clause requires these procedures, I agree that the case must be remanded as the Court orders.

The Court, however, states that it does not now decide whether the parolee is also entitled at each hearing to the assistance of retained counsel or of appointed counsel if he is indigent. *Goldberg* v. *Kelly,* 397 U. S. 254 (1970), nonetheless plainly dictates that he at least "must be allowed to retain an attorney if he so desires." *Id.,* at 270. As the Court said there, "Counsel can help delineate the issues, present the factual contentions in an orderly manner, conduct cross-examination, and generally safeguard the interests of" his client. *Id.,* at 270–271. The only question open under our precedents is whether counsel must be furnished the parolee if he is indigent.

MR. JUSTICE DOUGLAS, dissenting in part.

Each petitioner was sentenced for a term in an Iowa penitentiary for forgery. Somewhat over a year later each was released on parole. About six months later, each was arrested for a parole violation and confined in a local jail. In about a week, the Iowa Board of Parole revoked their

paroles and each was returned to the penitentiary. At no time during any of the proceedings which led to the parole revocations were they granted a hearing or the opportunity to know, question, or challenge any of the facts which formed the basis of their alleged parole violations. Nor were they given an opportunity to present evidence on their own behalf or to confront and cross-examine those on whose testimony their paroles were revoked.

Each challenged the revocation in the state courts and, obtaining no relief, filed the present petitions in the Federal District Court, which denied relief. Their appeals were consolidated in the Court of Appeals which, sitting en banc, in each case affirmed the District Court by a four-to-three vote, 443 F. 2d 942. The cases are here on a petition for a writ of certiorari, 404 U. S. 999, which we granted because there is a conflict between the decision below and *Hahn* v. *Burke,* 430 F. 2d 100, decided by the Court of Appeals for the Seventh Circuit.

Iowa has a board of parole [1] which determines who shall be paroled. Once paroled, a person is under the supervision of the director of the division of corrections of the Department of Social Services, who, in turn, supervises parole agents. Parole agents do not revoke the parole of any person but only recommend that the board of parole revoke it. The Iowa Act provides that each parolee "shall be subject, at any time, to be taken into custody and returned to the institution" from which he

---

[1] Iowa Code § 247.5 (1971) provides in part:

"The board of parole shall determine which of the inmates of the state penal institutions qualify and thereafter shall be placed upon parole. Once an inmate is placed on parole he shall be under the supervision of the director of the division of corrections of the department of social services. There shall be a sufficient number of parole agents to insure proper supervision of all persons placed on parole. Parole agents shall not revoke the parole of any person but may recommend that the board of parole revoke such parole."

was paroled.[2]   Thus, Iowa requires no notice or hearing to put a parolee back in prison, *Curtis* v. *Bennett,* 256 Iowa 1164, 131 N. W. 2d 1; and it is urged that since parole, like probation, is only a privilege it may be summarily revoked.[3]   See *Escoe* v. *Zerbst,* 295 U. S. 490, 492–493; *Ughbanks* v. *Armstrong,* 208 U. S. 481.   But we have long discarded the right-privilege distinction.   See, *e. g., Graham* v. *Richardson,* 403 U. S. 365, 374; *Bell* v. *Burson,* 402 U. S. 535, 539; *Pickering* v. *Board of Education,* 391 U. S. 563, 568; cf. Van Alstyne, The Demise of the Right-Privilege Distinction in Constitutional Law, 81 Harv. L. Rev. 1439 (1968).

The Court said in *United States* v. *Wilson,* 7 Pet. 150, 161, that a "pardon is a deed."   The same can be said of a parole, which when conferred gives the parolee a degree of liberty which is often associated with property interests.

---

[2] *Id.,* § 247.9 provides in part:

"All paroled prisoners shall remain, while on parole, in the legal custody of the warden or superintendent and under the control of the chief parole officer, and shall be subject, at any time, to be taken into custody and returned to the institution from which they were paroled."

[3] "A fundamental problem with [the right-privilege] theory is that probation is now the most frequent penal disposition just as release on parole is the most frequent form of release from an institution.   They bear little resemblance to episodic acts of mercy by a forgiving sovereign.   A more accurate view of supervised release is that it is now an integral part of the criminal justice process and shows every sign of increasing popularity.   Seen in this light, the question becomes whether legal safeguards should be provided for hundreds of thousands of individuals who daily are processed and regulated by governmental agencies.   The system has come to depend on probation and parole as much as do those who are enmeshed in the system.   Thus, in dealing with claims raised by offenders, we should make decisions based not on an outworn cliche but on the basis of present-day realities."   F. Cohen, The Legal Challenge to Corrections: Implications for Manpower and Training 32 (Joint Commission on Correctional Manpower and Training 1969).

We held in *Goldberg* v. *Kelly,* 397 U. S. 254, that the termination by a State of public assistance payments to a recipient without a prior evidentiary hearing denies him procedural due process in violation of the Fourteenth Amendment. Speaking of the termination of welfare benefits we said:

> "Their termination involves state action that adjudicates important rights. The constitutional challenge cannot be answered by an argument that public assistance benefits are 'a "privilege" and not a "right." ' *Shapiro* v. *Thompson,* 394 U. S. 618, 627 n. 6 (1969). Relevant constitutional restraints apply as much to the withdrawal of public assistance benefits as to disqualification for unemployment compensation, *Sherbert* v. *Verner,* 374 U. S. 398 (1963); or to denial of a tax exemption, *Speiser* v. *Randall,* 357 U. S. 513 (1958); or to discharge from public employment, *Slochower* v. *Board of Higher Education,* 350 U. S. 551 (1956). The extent to which procedural due process must be afforded the recipient is influenced by the extent to which he may be 'condemned to suffer grievous loss,' *Joint Anti-Fascist Refugee Committee* v. *McGrath,* 341 U. S. 123, 168 (1951) (Frankfurter, J., concurring), and depends upon whether the recipient's interest in avoiding that loss outweighs the governmental interest in summary adjudication. Accordingly, as we said in *Cafeteria & Restaurant Workers Union* v. *McElroy,* 367 U. S. 886, 895 (1961), 'consideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action.' See also *Hannah* v. *Larche,* 363 U. S. 420, 440, 442 (1960)." 397 U. S., at 262–263.

Under modern concepts of penology, paroling prisoners is part of the rehabilitative aim of the correctional philosophy. The objective is to return a prisoner to a full family and community life. See generally Note, Parole Revocation in the Federal System, 56 Geo. L. J. 705 (1968); Note, Parole: A Critique of Its Legal Foundations and Conditions, 38 N. Y. U. L. Rev. 702 (1963); Comment, 72 Yale L. J. 368 (1962); and see *Baine* v. *Beckstead,* 10 Utah 2d 4, 347 P. 2d 554 (1959). The status he enjoys as a parolee is as important a right as those we reviewed in *Goldberg* v. *Kelly.* That status is conditioned upon not engaging in certain activities and perhaps in not leaving a certain area or locality. Violations of conditions of parole may be technical, they may be done unknowingly, they may be fleeting and of no consequence.[4] See, *e. g., Arciniega* v. *Freeman,* 404 U. S. 4; Cohen, Due Process, Equal Protection and State Parole Revocation Proceedings, 42 U. Colo. L. Rev. 197, 229 (1970). The parolee should, in the concept of fairness implicit in due process, have a chance to explain. Rather, under Iowa's rule revocation proceeds on the *ipse dixit* of the parole agent; and on his word alone each of these petitioners has already served three additional years in prison.[5] The charges may or may not be true. Words of explanation may be adequate to transform into trivia what looms large in the mind of the parole officer.

"[T]here is no place in our system of law for reach-

[4] The violations alleged in these cases on which revocation was based are listed by the Court of Appeals, 443 F. 2d 942, 943–944, nn. 1 and 2.

For a discussion of the British system that dispenses with precise conditions usually employed here see 120 U. Pa. L. Rev. 282, 311–312 (1971). As to conditions limiting constitutional rights see *id.,* at 313–324, 326–339.

[5] As to summary deprivations of individual liberty in Communist nations, see, *e. g.,* Shao-chuan Leng, Justice In Communist China 34 (1967); 1 P. Tang, Communist China Today 271 (2d ed. 1961); J. Hazard, Communists and Their Law 121–126 (1969).

ing a result of such tremendous consequences without ceremony—without hearing, without effective assistance of counsel, without a statement of reasons." *Kent* v. *United States,* 383 U. S. 541, 554 (1966).

Parole,[6] while originally conceived as a judicial function, has become largely an administrative matter. The parole boards have broad discretion in formulating and imposing parole conditions. "Often vague and moralistic, parole conditions may seem oppressive and unfair to the parolee." R. Dawson, Sentencing 306 (1969). They are drawn "to cover any contingency that might occur," *id.,* at 307, and are designed to maximize "control over the parolee by his parole officer." *Ibid.*

Parole is commonly revoked on mere suspicion that the parolee may have committed a crime. *Id.,* at 366–367. Such great control over the parolee vests in a parole officer a broad discretion in revoking parole and also in counseling the parolee—referring him for psychiatric treatment or obtaining the use of specialized therapy for narcotic addicts or alcoholics. *Id.,* at 321. Treatment of the parolee, rather than revocation of his parole, is a common course. *Id.,* at 322–323. Counseling may include extending help to a parolee in finding a job. *Id.,* at 324 *et seq.*

A parolee, like a prisoner, is a person entitled to constitutional protection, including procedural due process.[7] At the federal level, the construction of regulations of the Federal Parole Board presents federal questions of

---

[6] "Parole is used after a sentence has been imposed while probation is usually granted in lieu of a prison term." R. Clegg, Probation and Parole 22 (1964). See *Baine* v. *Beckstead,* 10 Utah 2d 4, 9, 347 P. 2d 554, 558; *People ex rel. Combs* v. *LaVallee,* 29 App. Div. 2d 128, 131, 286 N. Y. S. 2d 600, 603.

[7] See President's Commission on Law Enforcement and Administration of Justice, Task Force Report: Corrections 83, 84 (1967); 120 U. Pa. L. Rev. 282, 348–358 (1971).

which we have taken cognizance. See *Arciniega* v. *Freeman*, 404 U. S. 4. At the state level, the construction of parole statutes and regulations is for the States alone, save as they implicate the Federal Constitution in which event the Supremacy Clause controls.

It is only procedural due process, required by the Fourteenth Amendment, that concerns us in the present cases. Procedural due process requires the following.

If a violation of a condition of parole is involved, rather than the commission of a new offense, there should not be an arrest of the parolee and his return to the prison or to a local jail.[8] Rather, notice of the alleged violation should be given to the parolee and a time set for a hearing.[9] The

[8] As Judge Skelly Wright said in *Hyser* v. *Reed*, 115 U. S. App. D. C. 254, 291, 318 F. 2d 225, 262 (1963) (concurring in part and dissenting in part):

"Where serious violations of parole have been committed, the parolee will have been arrested by local or federal authorities on charges stemming from those violations. Where the violation of parole is not serious, no reason appears why he should be incarcerated before hearing. If, of course, the parolee willfully fails to appear for his hearing, this in itself would justify issuance of the warrant." Accord, *In re Tucker*, 5 Cal. 3d 171, 199–200, 486 P. 2d 657, 676 (1971) (Tobriner, J., concurring and dissenting).

[9] As we said in another connection in *Greene* v. *McElroy*, 360 U. S. 474, 496–497:

"Certain principles have remained relatively immutable in our jurisprudence. One of these is that where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue. While this is important in the case of documentary evidence, it is even more important where the evidence consists of the testimony of individuals whose memory might be faulty or who, in fact, might be perjurers or persons motivated by malice, vindictiveness, intolerance, prejudice, or jealousy. We have formalized these protections in the requirements of confrontation and cross-examination. They have ancient roots. They find expression in the Sixth Amendment which provides that in all criminal cases the accused shall enjoy the right 'to be confronted

hearing should not be before the parole officer, as he is the one who is making the charge and "there is inherent danger in combining the functions of judge and advocate." *Jones* v. *Rivers,* 338 F. 2d 862, 877 (CA4 1964) (Soboloff, J., concurring). Moreover, the parolee should be entitled to counsel.[10] See *Hewett* v. *North Carolina,* 415 F. 2d 1316, 1322–1325 (CA4 1969); *People ex rel. Combs* v. *LaVallee,* 29 App. Div. 2d 128, 286 N. Y. S. 2d 600 (1968); *Perry* v. *Williard,* 247 Ore. 145, 427 P. 2d 1020 (1967). As the Supreme Court of Oregon said in *Perry* v. *Williard,* "A hearing in which counsel is absent or is present only on behalf of one side is inherently unsatisfactory if not unfair. Counsel can see that relevant facts are brought out, vague and insubstantial allegations discounted, and irrelevancies eliminated." *Id.,* at 148,

---

with the witnesses against him.' This Court has been zealous to protect these rights from erosion. It has spoken out not only in criminal cases, but also in all types of cases where administrative and regulatory actions were under scrutiny." (Citations omitted.)

[10] American Bar Association Project on Standards for Criminal Justice, Providing Defense Services 43 (Approved Draft 1968); Model Penal Code § 301.4, § 305.15 (1) (Proposed Official Draft 1962); R. Dawson, Sentencing (1969). For the experience of Michigan in giving hearings to parolees see *id.,* at 355. In Michigan, it is estimated that only one out of six parole violators retains counsel. One who cannot afford counsel is said to be protected by the hearing members of the board. *Id.,* at 354. The number who ask for public hearings are typically five or six a year, the largest in a single year being 10. Michigan has had this law since 1937. *Id.,* at 355. But the Michigan experience may not be typical, for a parole violator is picked up and returned at once to the institution from which he was paroled. *Id.,* at 352–353.

By way of contrast, parole revocation hearings in California are secretive affairs conducted behind closed doors and with no written record of the proceedings and in which the parolee is denied the assistance of counsel and the opportunity to present witnesses on his behalf. Van Dyke, Parole Revocation Hearings in California: The Right to Counsel, 59 Calif. L. Rev. 1215 (1971). See also Note, 56 Geo. L. J. 705 (1968) (federal parole revocation procedures).

427 P. 2d, at 1022.  Cf. *Mempa* v. *Rhay*, 389 U. S. 128, 135.

The hearing required is not a grant of the full panoply of rights applicable to a criminal trial.  But confrontation with the informer may, as *Roviaro* v. *United States*, 353 U. S. 53, illustrates, be necessary for a fair hearing and the ascertainment of the truth.  The hearing is to determine the fact of parole violation.  The results of the hearing would go to the parole board—or other authorized state agency—for final action, as would cases which involved voluntary admission of violations.

The rule of law is important in the stability of society.  Arbitrary actions in the revocation of paroles can only impede and impair the rehabilitative aspects of modern penology.  "Notice and opportunity for hearing appropriate to the nature of the case," *Boddie* v. *Connecticut*, 401 U. S. 371, 378, are the rudiments of due process which restore faith that our society is run for the many, not the few, and that fair dealing rather than caprice will govern the affairs of men.[11]

I would not prescribe the precise formula for the management of the parole problems.  We do not sit as an ombudsman, telling the States the precise procedures they must follow.  I would hold that so far as the due process requirements of parole revocation are concerned:[12]

(1) the parole officer—whatever may be his duties under various state statutes—in Iowa appears to be an agent having some of the functions of a prosecutor and

---

[11] The Brief of the American Civil Liberties Union, *amicus curiae*, contains in Appendix A the States that by statute or decision require some form of hearing before parole is revoked and those that do not.  All but nine States now hold hearings on revocation of probation and parole, some with trial-type rights including representation by counsel.

[12] We except of course the commission of another offense which from the initial step to the end is governed by the normal rules of criminal procedure.

of the police: the parole officer is therefore not qualified as a hearing officer;

(2) the parolee is entitled to a due process notice and a due process hearing of the alleged parole violations including, for example, the opportunity to be confronted by his accusers and to present evidence and argument on his own behalf; and

(3) the parolee is entitled to the freedom granted a parolee until the results of the hearing are known and the parole board—or other authorized state agency—acts.[13]

I would reverse the judgments and remand for further consideration in light of this opinion.

---

[13] The American Correctional Association states in its Manual of Correctional Standards 279 (3d ed. 1966) that:

"To an even greater extent than in the case of imprisonment, probation and parole practice is determined by an administrative discretion that is largely uncontrolled by legal standards, protections, or remedies. Until statutory and case law are more fully developed, it is vitally important within all of the correctional fields that there should be established and maintained reasonable norms and remedies against the sorts of abuses that are likely to develop where men have great power over their fellows and where relationships may become both mechanical and arbitrary."

And it provides for parole revocation hearings:

"As soon as practicable after causing an alleged violator [to be] taken into custody on the basis of a parole board warrant, the prisoner should be given an opportunity to appear before the board or its representative. The prisoner should be made fully aware of the reasons for the warrant, and given ample opportunity to refute the charges placed against him or to comment as to extenuating circumstances. The hearing should be the basis for consideration of possible reinstatement to parole supervision on the basis of the findings of fact or of reparole where it appears that further incarceration would serve no useful purpose." *Id.*, at 130.

The American Bar Association states at p. 10 of its brief *amicus* in the present cases that it is "in full agreement with the American Correctional Association in this instance. The position that a hearing is to be afforded on parole revocation is consistent with several sets of criminal justice standards formally approved by the Association through its House of Delegates."