362 A.2d 135.

STATE *vs.* GERARD J. SALVAIL *et al.*

AUGUST 2, 1976.

PRESENT: Paolino, Joslin, Kelleher and Doris, JJ.

JOSLIN, J. On May 23, 1974 the defendant Gerard J. Salvail, after pleading nolo contendere in the Superior Court to an indictment charging him with breaking and entering, was sentenced to a 5-year term, but the execution thereof was suspended and he was placed on probation; on January 3, 1975 the defendant, Thomas H. Austin, having previously been indicted for statutory burning, entered into a deferred sentence agreement with the Attorney General whereupon a Superior Court justice upon his plea of nolo contendere formally deferred sentencing him; on June 6, 1975 both defendants were presented to the Superior Court and, after a hearing, the defendant Salvail was adjudged to be in violation of his probation, his suspended sentence was revoked, and a sentence of 3 years was imposed, and on the same day, at the same hearing, before the same trial justice, the defendant Austin was found to have violated his deferred sentence agreement and a sentence of 3 years was imposed. Both defendants appealed, and the sole issue is whether the reception of certain evidence at the violation hearing contravened their due process rights.[1]

The joint violation hearing was based on an incident occurring on May 18, 1975 for which defendants were arrested and charged with breaking and entering.[2] At that hearing, Officer Ernest H. Golding of the North Kingstown Police Department testified that at about 4 a.m., while on duty in the Post Road area, he observed a motor vehicle parked near the side entrance to the Colonial Liquor Store (hereinafter "Colonial"). When he was advised by radio

---

[1] For purposes of due process, probation and deferred sentence revocation hearings are equivalent, *State* v. *Bettencourt,* 112 R. I. 706, 708-09 n.2, 315 A.2d 53, 54 n.2 (1974); *State* v. *Plante,* 109 R. I. 371, 377-78, 285 A.2d 395, 398 (1972); and hence what we say here applies equally to each defendant.

[2] Both defendants have since been tried and convicted on breaking and entering indictments.

that the officer previously on duty in that area had not seen the vehicle parked there at 3:30 a.m., his suspicions were aroused. Accordingly, he kept the vehicle under surveillance, and about 5 minutes later observed it leaving its parking space and driving off. He first followed and then stopped it. After identifying defendants as the driver and occupant, he noticed several packages of beer in the vehicle. Upon learning from Officer William J. McGovern, who had responded to his radio call for assistance, that there had been a break at the Colonial, Officer Golding arrested defendants and took them and their automobile to the police station. According to Officer McGovern, defendant Austin, when advised that he was under arrest, replied, "[f]or what? I didn't hit no liquor store." That comment, the officer further testified, preceded any indication by the police that the arrest was connected with the breaking and entering of a liquor store.

Soon after defendants arrived at the station, Captain Charles E. O'Dell of the North Kingstown Police Department inspected their automobile. He found two six packs of Miller beer in bottles on the rear seat, and one full and another partially full six pack of the same beer in cans on the front seat. All the beer containers were cold to the touch and some were perspiring as if recently taken from a refrigerator. The captain also testified that the beer containers found in defendants' vehicle would have filled the then empty spaces of the refrigerated cooler at the Colonial which, according to the testimony of the clerk employed there, had been filled to capacity at closing time the previous night. The clerk's testimony also established that apart from the four six packs of Miller beer already referred to, several bottles of wine, a box with $238 in change and 150 cartons of cigarettes were missing. None of these other items, however, was recovered.

The defendants admitted that they had made several

4

purchases of beer on the day prior to the incident, that one had been made at Haxton's liquor store, and that perhaps one had even been made at the Colonial. They denied, however, breaking into the Colonial and they insisted that their only purpose in stopping near that establishment was to relieve themselves. Further, they explained that the beer in their automobile was cold because it had been kept in a portable cooler which just prior to the stop at the Colonial had been discarded because it was leaking.

At the conclusion of the hearing, the trial justice in a bench decision noted that defendants' automobile was observed at the scene of the crime, that they were in the vehicle, and that the containers found in their possession "* * * logically fitted into the empty spaces [in the Colonial refrigerator] which had been full at the time of the closing of the store." Upon these facts he concluded that each defendant was guilty of the violation charged.

On appeal, defendants do not contest the trial justice's finding that they are violators as being arbitrary or capricious,[3] but argue instead that it was error to permit Captain O'Dell to testify that the distributor of Miller beer in Rhode Island had advised him that the marking 06 04 5 appearing on the bottom of each can of beer in defendants' possession when arrested had been stamped thereon at the brewery in St. Louis in order to inform liquor store owners of the date when the can should be removed from the shelves and returned to the distributor.

The basis of defendants' attack is that this testimony was not only hearsay, but was "compound" or "totem pole" hearsay because it came to the captain from a dis-

---

[3]Under our rule a trial justice's findings of fact at a revocation hearing will not be disturbed, unless he acted arbitrarily or capriciously. *Gonsalves* v. *Howard,* 113 R. I. 544, 549, 324 A.2d 338, 341 (1974); *Walker* v. *Langlois,* 104 R. I. 274, 282-83, 243 A.2d 733, 737-38 (1968); *Broccoli* v. *Kindelan,* 80 R. I. 436, 443, 98 A.2d 67, 71 (1952), *cert. denied,* 348 U. S. 879, 75 S.Ct. 120, 99 L.Ed. 692 (1954).

tributor who in turn must have obtained it from a brewery employee. Because it was third-party hearsay, defendants contend they were denied an opportunity to confront and cross-examine the source of the testimony on such subjects as the number of cans marked 06 04 5 that were distributed in Rhode Island and to which liquor stores. Through this kind of inquiry, they apparently hoped to establish that the number of Miller cans marked 06 04 5 coming to this state was so large as to make unimportant the coincidence between the expiration date on their cans and that on similar cans in the Colonial.

We fail to understand defendants' argument, which distinguishes totem pole from simple hearsay, and claims that only admission of the former violates their constitutional rights. But even if that distinction has some significance, it is unimportant because in any event the hearsay portion of Captain O'Dell's testimony was not a link in the chain of circumstances relied upon by the trial justice in finding that the evidence pointed only in the direction of defendants' involvement in the break. What was vital in his judgment was that the cans in defendants' possession carried distinctive markings, that the markings were identical to those appearing on the cans remaining in the Colonial refrigerator, and that they differed from those found on Miller cans in the Haxton's where defendants claim to have made a purchase or, with a single exception, in several other liquor stores in the Colonial neighborhood investigated by Captain O'Dell. Thus, the trial justice was concerned not with the meaning of the markings, but with the commonality or lack thereof between the markings appearing on the beer cans in defendants' possession and other cans either in Colonial's refrigerator or elsewhere. Since the evidence on these matters was not hearsay, because based upon Captain O'Dell's own observations, any error in admitting the totem pole hearsay was harmless.

While defendants' appeal is therefore lacking in merit, it does suggest questions about whether the recent cases of *Gagnon* v. *Scarpelli*, 411 U. S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973), and *Morrissey* v. *Brewer*, 408 U. S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972), cast any shadows on the longstanding practice prevailing here and elsewhere pursuant to which technical rules of evidence and procedure, including the rule against the admission of hearsay testimony, are not employed at violation hearings. *State* v. *Welch*, 114 R. I. 187, 192, 330 A.2d 400, 402 (1975); *O'Neill* v. *Sharkey*, 107 R. I. 524, 529, 268 A.2d 720, 723 (1970); *Almeida* v. *Langlois*, 97 R. I. 325, 327-28, 197 A.2d 498, 499 (1964).

The Supreme Court in those cases made clear that "* * * a probationer can no longer be denied due process, in reliance on the dictum in *Escoe* v. *Zerbst*, 295 U. S. 490, 492 (1935), that probation is an 'act of grace.' " *Gagnon* v. *Scarpelli*, *supra* at 782 n.4, 93 S.Ct. at 1760 n.4, 36 L.Ed.2d at 662 n.4, In addition, and chiefly in the *Morrissey* case, it enunciated the principles that the "full panoply of rights" applicable to a defendant at a criminal proceeding does not apply at a violation or revocation hearing, *Morrissey* v. *Brewer*, *supra* at 480, 92 S.Ct. at 2600, 33 L.Ed.2d at 494, and that due process is a flexible concept requiring only that the alleged violator be given an "* * * informal hearing structured to assure that the finding of a parole [probation or deferred sentence agreement] violation will be based on verified facts and that the exercise of discretion will be informed by an accurate knowledge of the parolee's [probationer's or deferred sentence defendant's] behavior." *Id.* at 484, 92 S.Ct. at 2602, 33 L.Ed.2d at 496.

Then, in its summary of the minimum due process requirements that are the just due of an accused at this kind of hearing, the Court includes "the right to confront

and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation)." *Id.* at 489, 92 S.Ct. at 2604, 33 L.Ed.2d at 499. Notwithstanding the inclusion of that requirement, it goes on to say that "* * * the process should be flexible enough to consider evidence including letters, affidavits, and other material that would not be admissible in an adversary criminal trial." *Id.*

Similarly, in *Gagnon* the Court made several statements which, at least initially, appear difficult to reconcile. There the Court first reiterated the probationer's right to confront adverse witnesses, *Gagnon* v. *Scarpelli, supra* at 786, 93 S.Ct. at 1762, 36 L.Ed.2d at 664, and then twice noted that "technical rules of procedure or evidence" do not apply in these hearings, *id.* at 786-87, 789, 93 S.Ct. at 1762, 1763, 36 L.Ed.2d at 664, 665-66. Moreover, the Court expressly considered some of the problems that might arise in *Morrissey's* wake, observing that:

> "An additional comment is warranted with respect to the rights to present witnesses and to confront and cross-examine adverse witnesses. Petitioner's greatest concern is with the difficulty and expense of procuring witnesses from perhaps thousands of miles away. While in some cases there is simply no adequate alternative to live testimony, we emphasize that we did not in *Morrissey* intend to prohibit use where appropriate of the conventional substitutes for live testimony, including affidavits, depositions, and documentary evidence. Nor did we intend to foreclose the States from holding both the preliminary and the final hearings at the place of violation or from developing other creative solutions to the practical difficulties of the *Morrissey* requirements." *Id.* at 783 n.5, 93 S.Ct. at 1760 n.5, 36 L.Ed.2d at 662 n.5.

The precise import of these perhaps inconsistent statements in terms of the admissibility of hearsay at a violation hearing has not been specifically addressed by the

parties. The state argued this case as if the rule permitting hearsay still obtains, while the defendants likewise assumed the admissibility of hearsay, disputing only the permissibility of totem pole hearsay. We do not resolve this issue, it being sufficient at this time to note the problem so that in an appropriate case it may be briefed and argued. In addition we observe that those courts considering the admissibility of hearsay at revocation hearings in the light of these Supreme Court cases have reached varying results. *See, e.g., United States* v. *Miller,* 514 F.2d 41, 43 (9th Cir. 1975); *State* v. *Jameson,* 112 Ariz. 315, 319, 541 P.2d 912, 916 (1975); *People* v. *Buford,* 42 Cal. App.3d 975, 982-83, 117 Cal. Rptr. 333, 338 (Ct. App. 1974); *State* v. *Mingua,* 71 Ohio Op. 2d 234, 237, 327 N.E.2d 791, 795 (Ct. App. 1974); *Commonwealth* v. *Davis,* 234 Pa. Super. 31, 45, 46, 336 A.2d 616, 624 (1975). *See also* Annot., 36 L.Ed.2d 1077, 1111-15 (1974).

The defendants' appeals are denied and dismissed, and the judgments appealed from are sustained.

Mr. Chief Justice Bevilacqua did not participate.

*Julius C. Michaelson,* Attorney General, *Judith Romney Wegner,* Special Asst. Attorney General, for plaintiff.

*William F. Reilly,* Public Defender, *Barbara Hurst,* Asst. Public Defender, *Emanuel J. Lauria,* Asst. Public Defender, for defendants.