WILLIAM J. STRAUSS, Petitioner

v.

JOAQUIN TORRE, Acting Director of Corrections
Government of Guam, Respondent
Civil No. 80-0031

ARTHUR SCOTT ROOT, Petitioner

v.

JOAQUIN TORRE, Acting Director of Corrections
Government of Guam, Respondent
Civil No. 80-0032

PETER M. SANTOS, Petitioner

v.

JOAQUIN TORRE, Acting Director of Corrections
Government of Guam, Respondent
Civil No. 80-0034

EDDIE REYES, Petitioner

v.

JOAQUIN TORRE, Acting Director of Corrections
Government of Guam, Respondent
Civil No. 80-0035

District Court of Guam
March 26, 1980

- - - - -

- - - - -

DUENAS, Judge

## MEMORANDUM ORDER

This Memorandum Order follows a February 22, 1980 Order of the District Court which required the immediate return of Petitioners STRAUSS, ROOT, SANTOS and REYES to the Halfway House Community Correctional Facility from which they were transferred without due process of law.

While the facts are different in each of the above-captioned cases, there can be no question that each Petitioner was removed from the Work Release Program of the Department of Corrections and returned to the Guam Penitentiary, Adult Main Facility without a proper hearing. A prisoner has certain vested rights, similar to a parolee, once he is afforced the benefits of participating in a work-release program. As stated in Durso v. Rowe, 579 F.2d 1365 (7th Cir. 1978) at 1371:

"We are compelled to note the strong similarities between parole and work-release. Indeed, many of the 'core values of unqualified liberty' which the Supreme Court recognized that parolees enjoy, see Morrissey, supra, 408 U.S. at 482, 92 S.Ct. 2593, are also present here. Like a parolee, a convict on work-release can pursue employment or education. He is eligible for leaves to renew contacts with his family. He may also be released to participate in unsupervised activities in the community, such as shopping, recreation and visiting friends. A work-release participant's freedom is more

137

limited than a parolee's. That difference, however, is one of degree only. The extent and nature of his freedom is qualitatively different from any 'freedom' allowed at the prison. Moreover, revocation of that status entails a loss far more grievous than that sustained by one who is transferred from one prison to another."

No evidence was presented by the Department of Corrections to suggest that there were exigent circumstances which would justify the removal of the petitioners from the work-release hearing without a prior hearing. Obviously prison administrators have great discretion in supervising prisoners; however, it is only when a prisoner's actions might reasonably endanger prison security or the safety of the public in general, that a prisoner's vested rights may be temporarily suspended prior to a full and adequate hearing.

Strauss was returned to the Adult Main Facility on December 5, 1979, where at a preliminary hearing the charges were read to him and he was asked how he wanted to plead. Strauss was then put in closed confinement for approximately a week where he was restricted to his cell for twenty-four hours a day, except for a half hour to take a shower and fresh air. The charges brought against Strauss had to do with an incident occurring around Thanksgiving when he called a local newspaper to complain about the fact that certain holiday furloughs had been cancelled. On December 11, 1979 a final hearing was held, which resulted in Strauss' permanent removal from the work-release program and a demotion in step level.

Root was returned to the Adult Main Facility sometime around March 26, 1978, and he was put into solitary confinement without the benefit of a hearing. On April 28, 1978 three was a reclassification hearing, where, according to his testimony, he was not given an opportunity to question witnesses regarding the assault charges brought against him.

Santos was taken out of the work-release program and returned to the Adult Main Facility on January 6, 1980, where he was placed in solitary confinement. There was a final hearing on January 18, 1980, where he was charged with possession of alcohol and antagonizing another inmate. After the final hearing, he was placed in closed confinement for thirty days, with an additional thirty-day probation.

Reyes was returned to the Adult Main Facility on November 25, 1978. He was immediately placed in closed confinement until a hearing on December 13, 1978 when he was found guilty of fighting with another inmate. Prison officials allegedly the denied Reyes' request to produce certain witnesses.

As developed above, the removal of a prisoner from a work-release program can result in a grievous loss of employment and certain due process standards attach to protect these rights to participate in the Step IV program. Not only were

138

the petitioners removed from the program without a hearing, but they were also placed in solitary confinement pending any actual resolution of the charges against them. The Government has offered no evidence to suggest that the isolated activities charged against each petitioner were such a serious threat to prison security or community safety that a prior hearing was not practicable.

This is not to minimize the seriousness of the offenses charged; however, benefits afforded a prisoner on a work-release program are similar to those of a prisoner on parole, thus requiring greater rights to a hearing than might normally be associated with general prison discipline and administrative procedures. The uncontradicted testimony of Root and Reyes suggest that the right to confront and produce witnesses was limited when their cases were heard.

The February 22, 1980 Order of the District Court, returning the petitioners to the Halfway House Facility, is not a ruling on the merits of the charges against them. The Order was issued so that petitioners' partially vested rights could be reestablished fully, pending a fair and adequate hearing seeking to divest any such rights to work on the outside. The Government has failed to show any justification for not conducting an adequate hearing before petitioners' actual removal from the work-release program, and for not affording petitioners their full due process rights at such a hearing. In some cases the gravity of certain offenses could justify the disciplinary removal of a prisoner from work release prior to a full hearing; however, no exigent circumstances to justify such removal have been shown by the Government to exist in the cases at bar.

Finally, the Government contends that the Director does not have the authority to transfer prisoners out of the Adult Main Facility to participate in work-release program, citing to §39100.2 and §55015 of the Government Code (providing that no prisoner at the Adult Main Facility shall be allowed to partici-pate in any extramural program without the express order of the parole board). However, assuming that these sections apply to the petitioners, it would seem that the Director conversely has no authority to remove prisoners from the Halfway House Correctional Facility without the express approval of the parole board. See e.g. Durso v. Rowe, supra, and §39100.2 of the Government Code, stating that the provisions of the Chapter dealing with parole shall apply when considering the eligibility for extramural programs.

There is no question that the petitioners' rights guaran-teed under Wolff v. McDonnel, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) and its progeny (e.g. Durso v. Rowe, supra) were ignored by the Director of Corrections. With the reestablishment of petitioners' rights to participate in the Halfway House Correctional Work-Release Program, the

Government is put on notice that an unhampered approach to the supervision and administration of inmates cannot override certain of their constitutional rights to a fair and adequate disciplinary hearing.

SO ORDERED.

Dated this 25th day of March, 1980.