[Crim. No. 6438. Fourth Dist., Div. Two. Jan. 13, 1975.]

In re THOMAS V. MOORE on Habeas Corpus.

## COUNSEL

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Alan S. Meth and Steven V. Adler, Deputy Attorneys General, for Appellant.

Rowan K. Klein, under appointment by the Court of Appeal, for Petitioner.

## OPINION

**GARDNER, P. J.**—Petitioner had been sentenced to state prison on a manslaughter charge and thereafter released on parole. He was subsequently arrested on another charge. *Morrissey* hearings were had and his parole was revoked. Petitioner filed a petition for writ of habeas corpus which petition was granted with the order that he be released. The Attorney General filed a notice of appeal and the trial court ordered the petitioner released on bail. This court stayed that order.

This case represents a classic overkill in the application of *Morrissey* v. *Brewer,* 408 U.S. 471 [33 L.Ed.2d 484, 92 S.Ct. 2593].

## Morrissey

The format our judicial system uses in the creation of legal principles—the so-called reasoned · opinion—lends itself to nitpicking. An opinion, particularly one which represents a ·departure from established principles, tends to become prolix as the court attempts to vindicate or rationalize its new position. Such an opinion becomes a treasure trove of polemic minutiae embellished with mountains of friendly but sometimes redundant authorities. By a careful and restrictive selection of choice phrases, the opinion can be used as authority for, and will give aid and comfort to, almost any given set of facts remotely resembling those on which the original opinion was based. Theoretically such an opinion gives us fixed and stable legal principles around which we can build our lives in what we choose to call an orderly system. Actually, in the subsequent application we give to these opinions, we often find ourselves with capricious, erratic, almost whimsical results. Thus, it·sometimes becomes necessary to step back from an artful and microscopic study of the words and phrases in an opinion and examine that opinion in its broad aspect—what was the problem? What was the suggested solution?

Long before *Morrissey* the courts had abandoned the ancient concept that when an individual is placed in prison, he is no longer a fellow-member of the human race. *Morrissey* held that when society affords a prisoner a measure of freedom called parole, it places upon him certain responsibilities and at the same time affords him certain corresponding rights. Thus, *Morrissey* held that before the parolee may be returned to prison, fundamental principles of fair play demand that there be some reason for so doing. It established in broad strokes that the parolee be afforded two hearings, a prerevocation or. in-community hearing to be held at or near the place of the alleged violation, and a revocation hearing to be held in the institution. It outlined the basic procedures for each hearing and held that such hearings were to be held reasonably promptly in order that the prisoner not be prejudiced by the passage of time. Obviously, depending on the facts of each case, some hearings would have to be held within days, others within months. No dogmatic blueprint was established or intended by *Morrissey*. The case clearly did not attempt to set up any manual of procedure for the various jurisdictions, nor did it establish any kind of a judicial strait jacket by which the courts substituted themselves for the correctional authorities. It noted that the concept of due process requires the weighing of the interests of the parties involved and made it clear that it was promulgating a flexible doctrine to be administered reasonably. "We cannot write a

code of procedure; that is the responsibility of each State. . . We have no thought to create an inflexible structure for parole revocation procedures." (*Morrissey, supra,* pp. 488-490 [33 L.Ed.2d pp. 498-499].)

The judicial process being what it is, *Morrissey* has spawned a plethora of judicial opinions many of which are complex and convoluted beyond description as the courts have wrestled with the application of the fairly simple principles of *Morrissey* as new and often unanticipated factual situations develop. By casual count, this state now has in excess of 20 published opinions interpreting *Morrissey* and applying it to particular sets of circumstances. This court recently had pending before it over 70 such cases.

The point of these observations is that *Morrissey* should be applied in its broad constitutional sense, not dogmatically, artificially, or, least of all, unreasonably.

### THE PETITIONER

It is necessary that we examine the petitioner in some detail.

Under the indeterminate sentence law, a judge turned petitioner over to the correctional authorities with only a minimum and maximum sentence as a guideline to those authorities as to his future. At that point, the judicial process stepped aside and the responsibility for petitioner's incarceration, his treatment and any program for rehabilitation—including parole—became primarily the responsibility of the correctional authorities.[1]

Thus, we must look at the petitioner through the same eyes as did the correctional authorities when, willingly or not, they accepted the responsibility for handling him in such a way as to give law abiding

[1]In recent years it has been contended that the indeterminate sentence law should be abandoned, that we should place the sentencing responsibility back in the courts, that parole should be abandoned with the idea that sentences be generally shorter than they are at present and that the individual serve the time ordered with time off for good behavior, that there be appellate review of sentencing to avoid disparity, that we should face up to the fact that rehabilitation is seldom effected within a prison setting, that the real bases for criminal punishment are (1) the revenge society demands for anti-social conduct; (2) whatever deterrent the existence of such punishment may have on this or other individuals inclined to such anti-social conduct; and (3) simply isolating the offender from the rest of society for a certain period of time, knowing that at least for that period of quarantine society is being protected from his anti-social activities. However, this is not the time or the place for a debate on the indeterminate sentence law. It exists. It is up to the courts to do their part in an effort to make it work.

members of society maximum protection from his proven anti-social proclivities.

Petitioner is obviously a deeply troubled individual. Anyone who has spent any time in the sentencing process would have no difficulty in evaluating him as a classic example of that group of society's unfortunates known as sociopathic behavior problems or psychopathic personalities.

Petitioner first surfaced at the ripe old age of 16 when he was arrested for auto theft and placed on probation. At 17, he was arrested and fined for disturbing the peace. A few months later he was arrested for petty theft. A short time after this he was committed to the California Youth Authority for mistreatment of a 13-month-old baby of a married woman with whom he was living. The child required major medical attention for bruises, cuts, scratches, bites and cigarette burns. Originally placed in Preston, petitioner escaped and was sent to Tracy. He was paroled in 1956. By this time he was 18 or 19 years of age. He was discharged from parole in 1959 with a good parole record. In 1962, he pleaded guilty to battery and petty theft and was sentenced to 60 days in the county jail. He escaped from an honor farm and was sentenced to 90 days in the county jail. In 1963, he was sentenced to federal prison for auto theft. He was released in 1965. In 1966, he was arrested for child beating, convicted of child endangering and received a six-month sentence. This case involved the beating of a 10-year-old stepchild. It was due to a probation officer's pre-sentence investigation into this case that the manslaughter charge for which he received his present prison sentence was revealed.

In the meantime, he had married twice. The first at age 20 to a 16-year-old. Two children resulted from this union who are being supported by their mother. His second wife had three children by a prior marriage. It was the beating of one of these children which resulted in the six-month sentence and it was the death of another which resulted in his manslaughter conviction.

The manslaughter conviction resulted from petitioner's beating to death his four-year-old stepdaughter. He admitted administering severe whippings to this child. She had head injuries due to the whippings and also due to striking her head on the side of a car as she ran toward it. The child died and because of the bruised condition of her body, petitioner and his wife became frightened and buried the child in the San

Bernardino Mountains. Both the child's mother and the petitioner were charged with murder, pleaded guilty to manslaughter and were sentenced to prison.

At the time of sentencing (1967), the sentencing judge recommended Vacaville for psychiatric treatment. The initial social evaluation in prison was that the petitioner needed psychiatric treatment in order to cope with his problems, that he was quite emotionally unstable and lacked insight into his aggressive behavior.

Petitioner was released on parole in 1971 at age 35. In 1973, he remarried. Conflicts arose immediately and there were nine separations. Finally, he was arrested on April 15, 1973, charged with abduction of his estranged wife (violation of Pen. Code, § 207, kidnaping).

### THE PAROLE VIOLATION

On April 9, 1973, petitioner contacted his estranged wife and, according to her first story, threatened her with a knife, took her with him against her will and kept her with him for five days in his car. On April 15, 1973, when petitioner was fishing, his wife escaped and reported the details of her abduction to the authorities. Petitioner was arrested that date and on April 17, 1973, he was arraigned on a charge of kidnaping. On June 1, 1973, he pled guilty to false imprisonment; Penal Code sections 236, 237, and on June 22, 1973, was placed on probation for this offense. That same date he was placed on OHO (our hold only) status by the Adult Authority. The OHO status resulted from delays in receiving a court psychiatric report.

On June 27, 1973, petitioner was presented with parole violation charges at the Los Angeles County jail. That same date his parole agent prepared a report on the charges which report contained his supporting evidence. In the time elapsing between the time she made her complaint of kidnaping and the time the defendant entered his plea, the wife had had a change of heart and decided that the kidnaping was not quite as aggravated as she first reported. She now wanted a reconciliation. In October 1973, she wrote the Adult Authority and the trial judge in the Los Angeles County matter to this effect. The parole agent decided that there was some substance to the wife's present version and recommended that the defendant be continued on parole. His unit supervisor and the district parole administrator concurred.

On July 16, 1973, defendant filed a demand for a prerevocation hearing, requesting that his wife be there as a witness. This document advised that such a hearing would be held on July 19, 1973.

A prerevocation hearing was actually held on August 16, 1973, but a report of these proceedings was not completed until September 7, 1973.

At this hearing the petitioner was represented by an attorney. Petitioner, his wife and the parole agent all testified. The hearing officer prepared an exhaustive report which set forth the charges, a summary of the testimony of the witnesses, the findings of the hearing officer (probable cause to believe the petitioner had violated the two conditions charged, (a) the criminal violation, and (b) absenting himself from his parole agent's jurisdiction for the five-day period) and the evidence relied on. In the latter connection, the parole officer relied on the defendant's plea of guilty to Penal Code sections 236, 237, on information from the arrest and complaint reports as contained in the parole officer's violation report, and on petitioner's wife's inconsistent statements which led the hearing officer to the opinion that she was "under extreme pressure at the hearing and not telling the complete truth."

On September 10, 1973, petitioner requested a revocation hearing at which he demanded the appearance of two witnesses, his wife and the parole agent, and also requested representation by counsel.

On September 27, 1973, he withdrew his request to be represented by counsel at his revocation hearing. This hearing was held on October 25, 1973. It was held before two members of the Adult Authority and a staff representative. Again, the petitioner, his wife and his parole agent testified. Petitioner pled guilty to charge I (violation of Pen. Code, §§ 236, 237), and the panel dismissed charge II (absenting himself from his parole agent during the five-day "abduction"). The dismissal was due in part because it was a part of charge I and the board found that the five days was not a very long period to be PAL (a code apparently meaning absent without leave). The panel observed that the wife was evasive.

The Adult Authority decided that due to petitioner's past behavior, the fact that he was emotionally unstable, and had a low tolerance level in coping with stressful situations, that it would be to his and the community's advantage to transfer him to "Category D" (again, some kind of Adult Authority code meaning back into custody), and to have a psychiatric referral for further evaluation.

In the meantime on October 16, 1973, petitioner filed a petition for writ of habeas corpus alleging delay in both the prerevocation and revocation hearings. An amended petition was filed by his present attorney on December 21, 1973, alleging that the plea of guilty to Penal Code sections 236, 237, was part of a plea bargain as a part of which his parole agent indicated to the district attorney and the public defender that if he pleaded guilty, his parole would not be violated. (The parole agent denied this allegation at the parole revocation hearing—merely observing the obvious—that by reason of the wife's change of attitude and story the petitioner probably would not have been convicted if he had not pleaded guilty.)

On January 18, 1974, the return to the petition for writ of habeas corpus was filed. On January 21, the matter was argued and taken under submission by the trial court. On January 28, the writ was granted. The Attorney General moved for reconsideration because the matter of *coram nobis* mentioned below had not been brought up until the date of the hearing. A hearing was held on the motion for reconsideration and the motion was denied. This appeal followed.

In the meantime on January 4, 1974, the Superior Court in Los Angeles County granted the petitioner's motion for writ of error *coram nobis* on the Penal Code sections 236, 237, charges.[2]

In granting the petition for a writ of habeas corpus, the trial court went all out. It ordered that the petitioner be released and reinstated on parole and when the Attorney General appealed, the trial court ordered bail in the amount of $1,000. As indicated, this court stayed the latter order.

### CONTENTIONS AND DISPOSITION

■ If the trial court granted this petition on the basis that the hearing officer at the prerevocation hearing or the Adult Authority at the revocation hearing abused their discretion in their rulings, that holding is clearly in error. The details of this case have been set forth at some length and show the need to repose discretion in those agencies and the further need for the courts to exercise restraint in second-guessing these administrative rulings. Based on petitioner's background and his present

---

[2]The clerk's minutes state "on the court's own motion the information is dismissed. The sheriff is directed to return the defendant to Chino for his parole hearing on January 8, 1974." (The parole hearing of Jan. 8, 1974, remains a mystery and for all we know the petitioner may have long since been paroled.) However, the court's formal order merely vacated the plea and the subsequent judgment.

involvement, no reasonable man could complain of the finding of probable cause by the hearing officer and the finding of a parole violation by the Adult Authority. It is to be remembered that the power to grant or revoke parole is vested in the parole board, not the courts. Petitioner's parole was not terminated fraudulently, by whim or caprice or without factual foundation. Petitioner received two full and fair hearings. Good cause existed for the parole revocation. It is not the function of the trial court to second-guess the parole board on the exercise of its discretion. It is true that the fact that the trial court in Los Angeles County had granted a petition for writ of error *coram nobis* was not before the parole board. Under any circumstances, this was not controlling. The facts contained in the parole agent's violation report in the prerevocation hearing report and the revocation report were not controverted in court by the petitioner.

Thus, if the trial court granted the petition for writ of habeas corpus on the ground that good cause did not exist for the petitioner's parole revocation, the trial court was in error.

Neither is there any cause for complaint as to the format of the hearing. It complied in every respect with *Morrissey*.

If delay was the basis for the trial court's ruling that ruling was again in error—for two reasons:

First, there was no unreasonable delay.

Considering the facts of this case and the realities of criminal prosecution and the consequences on parole status, petitioner's case was handled reasonably and with dispatch. Having a hearing during the time elapsing between arrest and disposition would hardly have inured to the benefit of the petitioner. During the early phase of the case, his wife was obviously mad at him, but during this period of time the cooling process set in and the case finally jelled into a minor disposition. After that, there was a delay in receiving a court psychiatric report. Again, probably this inured to the benefit of the petitioner. Thereafter each of his hearings was held promptly and with full recognition of his legal rights. Some of the delays were obviously reasonable administrative delays based on the realities of report writing, dictating, typing, reviewing, etc. One sizeable delay of approximately three weeks was occasioned by the need to prepare a typewritten report of the proceedings had at the prerevocation hearing. Furthermore, petitioner had requested representation by coun-

sel at both hearings. As noted by the Attorney General, this request came hard on the heels of *Gagnon* v. *Scarpelli,* 411 U.S. 778 [36 L.Ed.2d 665, 93 S.Ct. 1756], which held that a parolee was in certain cases entitled to such representation. Thus, petitioner was requesting counsel at a time when the Adult Authority was implementing procedures to weigh and grant requests for counsel. Such administrative adjustment requires time and would naturally result in confusion and delay. A careful examination of the nature and causes of the delays in this case warrants the conclusion that no delay was unreasonable.

Second, petitioner obviously suffered no prejudice by reason of the delay.

As indicated, the original delay between arrest and disposition worked to the petitioner's advantage. Had he had a hearing when his wife was screaming kidnaping, his future with the Adult Authority would have been bleak. Thereafter, the witnesses he requested appeared at both the prerevocation and the revocation hearing. There is not the slightest intimation that the accuracy or completeness of their testimony was affected by the passage of time. *In re La Croix,* 12 Cal.3d 146 [115 Cal.Rptr. 344, 524 P.2d 816], held that delay does not automatically entitle a parolee relief, that due process does not require that a parolee benefit from such a denial but only that no unfairness result therefrom. "Accordingly, in the absence of evidence that the Authority is not making a good faith effort to comply with the mandates of *Morrissey* and our decisions in this respect, a parolee whose parole has been revoked after a properly conducted revocation hearing is not entitled to have the revocation set aside unless it appears that the failure to accord him a prerevocation hearing resulted in prejudice to him at the revocation hearing. [Fn. omitted.]" (*In re LaCroix, supra,* p. 154.)

Defendant suffered no prejudice by reason of any delays. The trial court erred in granting the petition for writ of habeas corpus.[3]

Judgment reversed.

Kerrigan, J., and Kaufman, J., concurred.

Petitioner's application for a hearing by the Supreme Court was denied March 12, 1975.

---

[3]In addition, the order of the trial court granting bail was error. (*In re Law,* 10 Cal.3d 21 [109 Cal.Rptr. 573, 513 P.2d 621].)