**[Cite as *State v. Monroe*, 2020-Ohio-597.]**

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## CLARK COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 2018-CA-124 |
| | : | |
| v. | : | Trial Court Case No. 2017-CR-551 |
| | : | |
| DEON MONROE | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 21st day of February, 2020.

. . . . . . . . . . .

JOHN M. LINTZ, Atty. Reg. No. 0097715, Clark County Prosecutor's Office, Appellate Division, 50 East Columbia Street, Suite 449, Springfield, Ohio 45502
    Attorney for Plaintiff-Appellee

TRAVIS KANE, Atty. Reg. No. 0088191, 130 West Second Street, Suite 460, Dayton, Ohio 45402
    Attorney for Defendant-Appellant

. . . . . . . . . . . . .

FROELICH, J.

{¶ 1} Deon Monroe appeals from a judgment of the Clark County Court of Common Pleas, which found that he violated the terms of his community control, revoked his community control sanctions, and ordered him to serve concurrent sentences totaling two years in prison. For the following reasons, the trial court's judgment will be affirmed in part, reversed in part, and remanded for the limited purpose of the trial court's entering a revised judgment entry.

### I. Factual and Procedural History

{¶ 2} According to the bill of particulars and the facts stated at the plea hearing, police officers conducted a traffic stop of a vehicle that Monroe was operating on August 13, 2017. Upon receiving consent from the vehicle's owner (Monroe's girlfriend[1]), officers searched the vehicle and located a loaded black 9mm Hi Point Lugar under the passenger seat where Monroe had been observed reaching when the officers pulled him over. The handgun was tested and found to be operable. Monroe had a prior drug conviction, which rendered him unable to carry a gun legally.

{¶ 3} Monroe subsequently was indicted for carrying a concealed weapon, a fourth-degree felony (Count One), improper handling of firearms in a motor vehicle, a fourth-degree felony (Count Two), and having weapons while under disability, a third-degree felony (Count Three). In April 2018, Monroe pled no contest to all charges; the State agreed to a presentence investigation and to remain silent at sentencing. The trial court found Monroe guilty and ordered a presentence investigation. Prior to sentencing, defense counsel called a witness, who testified that she had placed the gun in Monroe's

---

[1] The bill of particulars states that the owner was Monroe's wife, but other portions of the record indicate that Monroe and the vehicle's owner were not married.

"wife's" vehicle and did not tell Monroe or his wife that it was there. At the conclusion of the hearing, the trial court delayed disposition until June 5, 2018.

{¶ 4} On June 5, 2018, the trial court sentenced Monroe to four years of community control with intensive supervision. As part of the intensive supervision, Monroe was required to (1) serve either 90 days in jail or 90 days on house arrest with electronic monitoring, (2) refrain from the use of alcohol and drugs and not enter establishments that serve alcohol, (3) be subject to random alcohol and drug screens, (4) complete 120 hours of community service, and (5) work with the Clark County reentry program to obtain employment and get a GED. The court also ordered Monroe to pay a supervision fee and court costs.

{¶ 5} The court informed Monroe that one of his conditions of community control would be compliance with all laws, so he could not drive without a license or insurance, which Monroe had done several times previously. The court told Monroe that because one of Monroe's convictions was for a felony of the third degree, "I [the judge] don't have to worry about that being a technical or nontechnical violation. I can sentence you to prison. If I find you are no longer amenable to community control, you will be sentenced to prison for 18 months on Count 1; 18 months on Count 2, and 24 months on Count 3 * * *."

{¶ 6} The trial court issued a written judgment entry on June 8, 2018. Monroe did not appeal from his convictions.

{¶ 7} On August 21, 2018, Monroe's probation officer filed an affidavit stating that Monroe had violated the terms of his community control in three respects: (1) failing to report to the probation department for scheduled office visits as directed, (2) submitting

fraudulent community service hours to the adult probation department, and (3) failing to comply with "his GPS schedule as ordered." At his preliminary hearing on the violations, Monroe agreed that he had received notice of the alleged violations, denied the violations, and waived a probable cause hearing.

{¶ 8} Over two days, the trial court heard testimony from several witnesses regarding the alleged violations. Stated generally, Robert Mims, Director of Re-Entry Services at Clark County (OIC) Opportunities for Individual Change, testified about how individuals are credited community service hours for participation in certain programs. Mims signed documentation showing that Monroe had completed 120 hours of community service for participation in the Opportunities for New Direction (OND) program and also participated in a nutrition program. Monroe had received certificates for completing the two programs. However, Alice Fent, electronic monitoring officer for the Clark County Common Pleas Court, testified that tracking data for Monroe showed him at OIC for limited periods of time and substantially less than 120 hours. Fent also provided information that Monroe had gone to locations not authorized by the terms of his electronic monitoring. Monroe's probation officer, Jason Hunt, testified that Monroe had indicated to him that he (Monroe) had completed his community service hours on site, which was not substantiated by GPS data. Hunt further testified that Monroe's GPS data showed him "all over town" on August 15, 2018. In addition, Hunt testified that Monroe failed to report to his probation officer on two occasions: June 27, 2018 and August 15, 2018.

{¶ 9} The trial court found that Monroe had violated the terms of his community control, and it imposed the previously-stated prison sentences, to be served concurrently

for a total of 24 months in prison. Monroe appeals from the revocation of his community control.

{¶ 10} Monroe's original appellate counsel filed a brief pursuant to *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), indicating that he found "no error by the trial court prejudicial to the rights of appellant which may be argued to this court on appeal." Upon an initial review, we found several non-frivolous issues related to the revocation of Monroe's community control. We rejected the *Anders* brief and appointed new counsel.

{¶ 11} Monroe, with new counsel, now raises two assignments of error, which we will address together:

1. The trial court abused its discretion when it revoked the Appellant's community control sanctions and sentenced the Appellant to two years in prison.

2. The trial court imposed a sentence that is contrary to law pursuant to R.C. 2953.08(G)(2) and R.C. 2929.15(B)(1)(c)(ii).

## II. Violation of Community Control

{¶ 12} Monroe first challenges the trial court's conclusion that he violated the conditions of his community control.

{¶ 13} The right to continue on community control depends upon compliance with the conditions of community control and is a matter within the sound discretion of the trial court. *State v. Lewis*, 2d Dist. Montgomery No. 23505, 2010-Ohio-3652, ¶ 11. Accordingly, we review the trial court's revocation of community control for an abuse of discretion. *State v. Morgan,* 2d Dist. Montgomery No. 26132, 2014-Ohio-5071, ¶ 11.

An abuse of discretion implies that the trial court's attitude was unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983); *State v. Dalton*, 2019-Ohio-4364, __ N.E.3d __, ¶ 11 (2d Dist.).

**{¶ 14}** "[A] revocation of community control punishes the failure to comply with the terms and conditions of community control, not the specific conduct that led to the revocation." *State v. Black*, 2d Dist. Montgomery No. 24005, 2011-Ohio-1273, ¶ 17. Crim.R. 32.3, which governs revocation of community control, provides that the trial court "shall not impose a prison term for violation of the conditions of a community control sanction or revoke probation except after a hearing at which the defendant shall be present and apprised of the grounds on which action is proposed."

**{¶ 15}** "Community control violation proceedings are not equivalent to criminal prosecutions." *Black* at ¶ 12. Nevertheless, "[a] defendant is entitled to certain due process protections before a court may revoke community control sanctions, although the full panoply of rights due a defendant in a criminal prosecution does not apply to the revocation of community control." *State v. Harmon*, 2d Dist. Champaign No. 2007-CA-35, 2008-Ohio-6039, ¶ 6, citing *Morrissey v. Brewer*, 408 U.S. 471, 480, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). First, a defendant is entitled to a preliminary hearing to determine whether there is probable cause to believe that the defendant has violated the terms of his or her community control. *Gagnon v. Scarpelli*, 411 U.S. 778, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973); *State v. Blakeman*, 2d Dist. Montgomery No. 18983, 2002 WL 857659, *2. Second, due process requires a final hearing to determine whether community control should be revoked. *Id*.

**{¶ 16}** At the final revocation hearing, the State must (1) provide the defendant

with written notice of the alleged violations of community control; (2) disclose the evidence against the defendant; (3) give the defendant an opportunity to be heard in person and to present witnesses and documentary evidence; (4) allow the defendant to confront and cross-examine adverse witnesses; (5) afford the defendant a neutral and detached hearing body; and, (6) provide the defendant with a written statement by the fact finder as to the evidence relied upon and the reasons for revoking community control. *State v. Klosterman*, 2d Dist. Darke Nos. 2015-CA-9 and 2015-CA-10, 2016-Ohio-232, ¶ 15; *State v. Gilreath*, 2d Dist. Greene No. 2000-CA-1, 2000 WL 896319, *2 (July 7, 2000).

**A. Community Service Hours**

{¶ 17} First, the trial court concluded that Monroe violated community control by submitting fraudulent community service hours to the adult probation department.

{¶ 18} Robert Mims, Director of Re-Entry Services at Clark County OIC, testified that individuals can complete community service hours through his program. With respect to Monroe specifically, his community services hours "were in line with his Thinking for a Change and nutrition program." The Thinking for a Change program is held on Tuesdays and Thursdays from 9:30 a.m. to 11:30 a.m., and Monroe would have needed to complete 60 hours to receive a completion certificate. Mims further stated that the nutrition program ran for six weeks for 90 minutes on Wednesdays.

{¶ 19} Monroe testified that OIC maintains a sign-in/sign-out sheet to keep track of individuals' presence. State's Exhibit 1 reflected that Monroe was present for 6 hours each on July 18-20, July 23-27, July 30-August 3, August 6-9, and August 13-15, for a total of 120 hours (20 days x 6 hours). Each date was signed by Mims as supervisor.

{¶ 20} Mims testified that Monroe would have been given homework for the

Thinking for a Change program, and the time spent on homework would have counted toward his community service hours. Mims stated that homework was due at the next scheduled class, and a person would be credited two and a half hours for each homework assignment. Mims stated that if an individual missed a class, that person would be given an out-of-class assignment to make up for the hours missed. Mims said that Monroe would have needed to complete the program (16 lessons) in order to obtain a certificate. Mims indicated that he verifies that participants complete all of their lessons by looking at their coursework. Monroe obtained a certificate of completion for "Social Skills and Cog. Self-Change T4C," signed by Mims on August 15, 2018. (*See* Def.'s Ex. A.) Mims testified that Monroe "did everything he's supposed to do to obtain the certificate. If not, he wouldn't have gotten it."

{¶ 21} Mims testified that the nutrition program was run by an Ohio State University extension program, and that the instructor kept attendance. Individuals were required to attend and participate on a consistent basis in order to obtain a certificate; if a student missed a class, he or she had to come back and make up the class when the classes restarted. Monroe obtained a certificate, dated September 5, 2018, indicating that he had successfully completed the nutrition program. (*See* Def.'s Ex. B.)

{¶ 22} Upon reviewing State's Exhibit 1, the trial court questioned Mims about Monroe's presence on site. When asked, "So this exhibit would indicate that [Monroe] was at your building for six hours a day," Mims responded, "Yes, sir. Yes, sir." Mims stated that hours are 8:30 a.m. to 2:30 p.m., and individuals are given credit for their hour-long lunch period. Mims later clarified that State Exhibit 1 also included times for which Monroe received credit for doing homework assignments off-site, and that the document

did not identify which dates he was actually there versus given credit for homework. Mims also later clarified that "[w]e don't given them two and a half hours credit for homework. We give them an opportunity to make up the six hours by doing the homework. * * * We give them six hours so that we keep straight on how many hours they are doing. We can't do two and a half --." When questioned by the trial court why individuals were given credit for six hours when they were only doing two and a half hours of homework, Mims responded, "* * * Then we will change that."

{¶ 23} Alice Fent, the electronic monitoring officer for the Clark County common pleas court, testified that she is able to retrieve data regarding the whereabouts of a particular GPS unit "24/7, 365 days a year." She further stated that the data is accurate, and it can locate a person within five and a half feet of the person's location.

{¶ 24} Fent generated GPS location reports showing Monroe's location between July 18, 2018 and August 16, 2018 (State's Ex. 2). The reports indicated that Monroe was present at 98 North Bechtle Avenue, the location of Mims's OIC program, for the following periods of time:

| Date | Total time |
| --- | --- |
| July 18, 2018 (Wed) | 2 hours, 28 minutes |
| July 24, 2018 (Tues) | 1 hour, 7 minutes |
| July 25, 2018 (Wed) | 59 minutes |
| August 1, 2018 (Wed) | 28 minutes |
| August 14, 2018 (Tues) | 13 minutes |
| August 15, 2018 (Wed) | 1 hour, 15 minutes |
| **TOTAL TIME:** | 7.166 hours |

{¶ 25} Defense counsel cross-examined Fent about the accuracy of the data. Fent acknowledged that, for several different dates, the departure time for one address (such as his Woodside address) and the arrival time at the next address (such as a Bellevue address) were the same. (Tr. at 56-57.) However, at the second day of the hearing, Fent explained that the GPS signal can "float," and "[i]t didn't mean that he left the home and went to a Bellevue address. He didn't go there." (Nov. 20 Tr. at 6.)

{¶ 26} Monroe's probation officer, Jason Hunt, testified that on August 16, 2018, Monroe submitted documentation that he had completed his community service requirement. Hunt stated that he was suspicious about the documentation, because Hunt was only permitted to be out from 9:00 a.m. to 12:00 p.m., but the document showed six hours of community service per day. Hunt asked the GPS monitor coordinator to see how often Monroe was at 98 North Bechtle and learned that there was a discrepancy between the hours reported and Monroe's locations.

{¶ 27} Hunt testified that Monroe did not say that he was doing homework for community service hours. Rather, Monroe told Hunt that he had gone to the Bechtle location to complete his hours. Based on the GPS data, Hunt concluded that Monroe had submitted fraudulent community service hours. On cross-examination, Hunt testified that he left to Mims what would constitute community service; "that's not for the probation department." (Nov. 20 Tr. at 23.)

{¶ 28} In concluding that Monroe violated his community service requirement, the court explained:

> * * * GPS would indicate he never spent any real time there based
>
> on the testimony of Mr. Mims as to how long those classes are supposed to

last. Mr. Mims says, "I wouldn't have signed these documents if he hadn't done it." Well, that's obviously not true. He must be relying on somebody else telling him he was there because he wasn't there.

Now, am I gonna fault the defendant for getting six hours of community service for homework he didn't do? I'm not gonna fault him. I'm not gonna credit him of it. That's a farce. We don't send somebody down to OIC to work for OIC. They get grant money to help people, not having people work for them. And in the case of GPS, he was never really there that long anyway.

{¶ 29} The trial court reasonably concluded that Monroe was present at OIC for substantially less than 120 hours and that he was credited for community services hours that he did not actually perform. Specifically, GPS data placed him at OIC's Bechtle address for approximately 7.2 hours only, and Mims testified that participants can receive credit for attending six hours of classes by completing approximately 2.5 hours of homework. The attendance log did not distinguish between hours when the participant was actually present at OIC and hours credited for homework completed elsewhere.

{¶ 30} Nevertheless, because Mims's program allowed for community service credit to be awarded even if a participant missed a class on-site, Monroe's limited time at OIC did not necessarily indicate his failure to comply with the terms of the community service program. Significantly, Monroe submitted evidence that he had completed the Thinking for a Change program and the Ohio State University Extension nutrition program and that he was credited with 120 hours of community service by Mims, the OIC director. Mims's testimony and Monroe's exhibits indicate that Monroe had completed the

programs to Mims's and the nutrition instructor's satisfaction, even if not to the satisfaction of the trial court or the probation department.

{¶ 31} The trial court's frustration with OIC's method of awarding community services hours is understandable and justified. However, in our view, Monroe cannot be penalized for failing to meet his community service requirements when he was sent to a specific program and that community service program's director has testified that Monroe completed his community service to the program's satisfaction and has provided Monroe certificates of completion for the programs. In the absence of evidence that Monroe acted outside of OIC's expectations, the fault, if any, lies with OIC, not with Monroe. Accordingly, under the specific facts of this case, the trial court abused its discretion in concluding that Monroe violated his community control sanctions by failing to complete his community service requirement.

**B. GPS Compliance**

{¶ 32} Second, the trial court concluded that Monroe failed to comply with his community control sanctions by failing to comply with "his GPS schedule as ordered."

{¶ 33} Fent testified that she placed a GPS monitor on Monroe's ankle on July 3, 2018, and his probation officer provided her with Monroe's schedule. Based on that schedule, Monroe was permitted to leave his home to go to OIC to attend classes on Monday through Friday (9:00 a.m. to noon), and on Wednesdays when he would go see his probation officer at 3:30 p.m.

{¶ 34} As stated above, Hunt became suspicious that Monroe was not complying with his GPS requirements based on Monroe's reported community service hours. After reviewing GPS reports generated by Fent, Hunt concluded that Monroe had failed to

comply with his GPS schedule. Specifically, Hunt testified that the GPS data for August 15, 2018, showed that Monroe "left 98 North Bechtle and did not return home for close to an hour; and when I had that report ran, it showed that he was all over town that day before he returned home." The GPS report indicated that Monroe was not at the Bechtle location or at his home between 11:18 a.m. and 12:03 p.m.; no stationary location was indicated. Hunt testified that Monroe admitted that he (Monroe) did not follow the electronic monitoring instructions; Monroe had told Hunt that he had stopped at his sister's home.

{¶ 35} The trial court found Monroe violated the terms of his GPS, stating:

I've got him going in one exhibit driving around town for a while. Looks like it takes anywhere from 9 to 12 minutes to get from his house to Bechtle Avenue and it took 46 minutes to get to his home, and he was driving around town. Was he allowed to go to his daughter's doctor appointments? Maybe he was, but I have no evidence that that's where he went at any of this time. * * *

The trial court did not abuse its discretion in reaching this conclusion.

**C. Missed Probation Department Meetings**

{¶ 36} Third, the trial court found that Monroe violated his community control by failing to report to the probation department for scheduled office visits as directed.

{¶ 37} Hunt testified that Monroe was placed on community control on June 5, 2018, and that he was required to report to his probation officer weekly. Hunt stated that Monroe failed to report on two occasions: June 27, 2018 and August 15, 2018. (GPS location data confirmed that Monroe went to see his probation officer on July 25 and on

August 8, 2018.)   Hunt testified that he would not have given Monroe permission to miss the July 27 office visit, because he had not yet tested clean.   After Monroe missed the August 15 appointment, Hunt called him and told him to be at his (Hunt's) office the following day; Monroe reported to the probation department on August 16.   Monroe reported to Hunt that he thought that he was supposed to report every other week.

{¶ 38} Based on Hunt's testimony that Monroe failed to report on two occasions, the trial court did not abuse its discretion in concluding that Monroe failed to report to the probation department for scheduled office visits as directed.

### III. Monroe's Prison Sentences

{¶ 39} Monroe further claims that the trial court erred in revoking his community control and imposing 24 months in prison.   He further raises that the court erred in ordering him to serve 18-month sentences for technical violations of his community control for his fourth-degree felonies.

{¶ 40} R.C. 2929.15(B) governs the penalties available to the sentencing court when an offender violates community control.[2]   Upon revoking a defendant's community control, the trial court may (1) lengthen the term of the community control sanction; (2) impose a more restrictive community control sanction; or (3) impose a prison term on the offender, subject to certain limitations.   R.C. 2929.15(B)(1), (3); *see State v. Brooks*, 103 Ohio St.3d 134, 2004-Ohio-4746, 814 N.E.2d 837, paragraph two of the syllabus.

{¶ 41} For all revocations, the prison term must be within the range of prison terms available for the offense for which community control had been imposed and the term

---

[2] R.C. 2929.15 has been amended several times in the past few years, with the most recent version effective October 17, 2019.   For purposes of this appeal, we apply the version in effect between September 29, 2017 and October 28, 2018.

may not exceed the prison term specified in the notice provided to the offender at the original sentencing hearing. R.C. 2929.15(B)(3). Of relevance here, R.C. 2929.15(B) further provides:

> If the prison term is imposed for any technical violation of the conditions of a community control sanction imposed for a felony of the fourth degree that is not an offense of violence and is not a sexually oriented offense or for any violation of law committed while under a community control sanction imposed for such a felony that consists of a new criminal offense and that is not a felony, the prison term shall not exceed one hundred eighty days.

R.C. 2929.15(B)(1)(c)(ii).

{¶ 42} A violation of community control need not be a criminal offense to be a non-technical violation of community control. *State v. Nelson*, 2018-Ohio-4763, 124 N.E.3d 450 (2d Dist.) (defendant's contact with person with whom he was to have no contact, although non-criminal in nature, was not a technical violation), appeal accepted, *04/03/2019 Case Announcements*, 2019-Ohio-1205; *see also State v. Kernall*, 2019-Ohio-3070, 132 N.E.3d 758, ¶ 16 (1st Dist.). We have found instructive the Twelfth District's distinction between administrative requirements facilitating community control (technical) from substantive rehabilitative requirements that address a significant factor contributing to a person's criminal conduct (non-technical). *Id.* at 32, citing *State v. Davis*, 12th Dist. Warren No. CA2017-11-156, 2018-Ohio-2672, ¶ 17-18; *see also, e.g., Kernall* at ¶ 18.

{¶ 43} It is undisputed that R.C. 2929.15(B)(1)(c) did not apply to Monroe's offense of having weapons while under disability, a third-degree felony. The trial court was

permitted to impose a 24-month sentence for the third-degree felony, and it was not required to determine whether the violations involved were technical or non-technical.

{¶ 44} Prior to the court's imposition of sentence on the community control violations, the prosecutor informed the trial court that the probation officer searched Monroe's home in October 2017 and found "digital scales, a glass smoking pipe with marijuana residue or suspected marijuana residue, and a large bag of green leafy matter in the house as well as quite a bit of currency." Monroe also tested positive for cocaine at that time. The prosecutor stated that she did not anticipate that the conduct would result in new charges. Defense counsel objected to the court's consideration of this information, as it was not related to Monroe's alleged community control violations.

{¶ 45} The court reviewed the previously-prepared presentence investigation report and spoke with Monroe. Monroe stated that Mims gave him permission to complete community service work at home and that his probation officer gave him permission to take his daughter to doctor appointments, to pick up his daughter on Sundays, and to go to a family reunion. Monroe stated that he failed his drug screens because was sick and "taking medication that I shouldn't have been that wasn't mines [sic]." Monroe further asserted that Hunt had changed his reporting requirement to every other week and then Hunt had "tried to say" that he switched it back to every week. Monroe said that the money and drugs and scales found at his home belonged to his girlfriend, with whom he lived. Monroe repeatedly stated that he was trying to comply with his community control requirements, and he told the court that he had completed additional programs in jail since his arrest. Monroe acknowledged that he did not have a valid driver's license, although he apparently had been driving while on community

control.

**{¶ 46}** The trial court concluded that Monroe was no longer amenable to community control and imposed 24 months in prison for the third-degree felony. Regardless of whether the violations of community control appear to be minor, the revocation of community control punishes the failure to comply with community control, not the specific conduct leading to the revocation.   *See, e.g., State v. Shumway*, 2d Dist. Greene No. 2017-CA-51, 2018-Ohio-1227, ¶ 12.   Accordingly, a prison sentence imposed upon revocation of community control is a "continuing consequence of the original conviction."   *Black*, 2d Dist. Montgomery No. 24005, 2011-Ohio-1273, at ¶ 13, citing, *e.g., State v. Wellbaum*, 2d Dist. Champaign No. 2000-CA-5, 2000 WL 1232773 (Sept. 1, 2000).   While other courts may or may not have revoked Monroe's community control based on the conduct presented, the trial court here did not abuse its discretion in revoking Monroe's community control.   Moreover, we cannot conclude that the court's 24-month sentence was clearly and convincingly unsupported by the record or contrary to law.   *See State v. Von Ward*, 2d Dist. Champaign No. 2015-CA-42, 2016-Ohio-5733 (applying the *Marcum* standard of review to defendant's sentence for a community control violation).

**{¶ 47}** However, we disagree with the trial court's conclusion that the presence of the third-degree felony removed the limitations imposed by R.C. 2929.15(B)(1)(c)(ii) for Monroe's felonies of the fourth degree.   Under Ohio law, a sentencing court "must consider each offense individually and impose a separate sentence for each offense." *State v. Saxon*, 109 Ohio St.3d 176, 2006-Ohio-1245, 846 N.E.2d 824, ¶ 9 (rejecting a sentence packaging approach to sentencing).   And while R.C. 2929.15(B)(1)(c) is written

in the singular, "[t]he Ohio Supreme Court has cautioned against 'making fine distinctions about the meaning of a statute based upon its use of the singular form of a word.' " *State v. Bishop*, 2019-Ohio-592, 132 N.E.3d 145, ¶ 14 (12th Dist.), quoting *State v. D.B.*, 150 Ohio St. 3d 452, 2017-Ohio-6952, 82 N.E.3d 1162, ¶ 16 (R.C. 2929.15(B)(1)(c) applies to a defendant on community control for multiple felonies of the fifth degree).   Nothing in the language of R.C. 2929.15(B)(1)(c) implies that the provisions do not apply simply because a defendant is serving community control for multiple felonies of different degrees.   Upon revoking a defendant's community control for multiple counts, the trial court must consider each count separately, including the statutory limitations appropriate for each count, when determining the appropriate sentences.

**{¶ 48}** In this case, Monroe committed two technical violations of his community control.   On one day, contrary to the terms of his GPS schedule, Monroe did not return directly home from his community service location on Bechtle Avenue, taking just under an hour to return home.   Monroe admitted to his probation officer that he had stopped at his sister's residence, although GPS data did not confirm that.   There is no indication that Monroe engaged in wrong-doing during that short time period.   In addition, Monroe missed two scheduled appointments with his probation officer; after the second missed appointment, Monroe reported the following day at the instruction of his probation officer. While the trial court was within its discretion to revoke Monroe's community control for failure to comply with these conditions, the trial court's prison sentences on Monroe's two fourth-degree felony offenses were limited to 180 days in prison.[3]

---

[3] We recognize that the modification of Monroe's sentences for his fourth-degree felonies is largely academic.   Because the trial court imposed a concurrent 24-month sentence for having weapons while under disability, Monroe's aggregate sentence of 24 months

**{¶ 49}** Monroe's assignments of error are overruled in part and sustained in part.

## IV. Conclusion

**{¶ 50}** The trial court judgment with respect to Monroe's conviction for having weapons while under disability will be affirmed. The portion of the trial court's judgment imposing 18-month sentences for carrying a concealed weapon and improper handling of firearms in a motor vehicle will be reversed; the sentences for those offenses will be modified to 180 days in prison, and the matter will be remanded for limited purposes of issuing a revised judgment entry consistent with our judgment herein and of notifying the appropriate prison officials of that revised judgment entry.

. . . . . . . . . . . . .

TUCKER, P.J. and DONOVAN, J., concur.

Copies sent to:

John M. Lintz
Travis Kane
Hon. Richard J. O'Neill

---

remains the same.