[Cite as *State v. Sanders*, 2022-Ohio-514.]

COURT OF APPEALS
DELAWARE COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO, | : | JUDGES: |
| | : | Hon. William B. Hoffman, P.J. |
| Plaintiff - Appellee | : | Hon. Patricia A. Delaney, J. |
| | : | Hon. Craig R. Baldwin, J. |
| -vs- | : | |
| | : | |
| JARELL SANDERS, | : | Case No. 21 CAA 01 0004 |
| | : | 21 CAA 01 0005 |
| Defendant - Appellant | : | |
| | : | O P I N I O N |

CHARACTER OF PROCEEDING:      Appeal from the Delaware County
Court of Common Pleas, Case Nos.
20CRI0100039 & 18CRI110663

JUDGMENT:      Affirmed

DATE OF JUDGMENT:      February 22, 2022

APPEARANCES:

For Plaintiff-Appellee      For Defendant-Appellant

MELISSA SCHIFFEL      WILLIAM T. CRAMER
Delaware County Prosecutor      470 Olde Worthington Road, Suite 200
Westerville, Ohio 43082
By: ELIZABETH MATUNE
Assistant Prosecuting Attorney
Delaware Co. Prosecuting Attorney
149 North Union Street
Delaware, Ohio 43015

*Baldwin, J.*

{¶1}   Defendant-appellant Jarell Sanders appeals his conviction and sentence from the Delaware County Court of Common Pleas. Plaintiff-appellee is the State of Ohio.

### STATEMENT OF THE FACTS AND CASE

{¶2}   On November 29, 2018, appellant was indicted in Case No. 18 CR I 11 0683 on one count of domestic violence in violation of R.C. 2919.25(A), a felony of the fourth degree.  At his arraignment on December 5, 2018, appellant entered a plea of not guilty to the charge.

{¶3}   Subsequently, the matter proceeded to a jury trial and appellant was found guilty of the charge. Pursuant to a Judgment Entry filed on April 24, 2019, appellant was placed on three years community control under specified terms and conditions. Among the same, appellant was ordered not to leave the State of Ohio without written consent from Adult Court Services, to report to his supervising officer as ordered, and to have no in-person contact with S.S., the victim.

{¶4}   Appellant then filed an appeal that was assigned Case No. 19 CAA 05 0033.

{¶5}   On June 18, 2019, appellee filed a Motion to Suspend Community Control Sanctions, alleging that appellant had violated specified conditions of his community control. Following a hearing held on July 5, 2019, the trial court found appellant to be in violation of the terms and conditions of his community control and reinstated the community control sanctions with an additional sanction that appellant serve an additional twelve days (12) in the Delaware County Jail.

{¶6}   Appellant then filed an appeal that was assigned Case No. 19 CAA 05 0033.

**{¶7}** Thereafter, while the appeal filed by appellant was pending, another Motion to Suspend Community Control Sanctions was filed on January 13, 2020, alleging that appellant had failed to make himself available for supervision and absconded from supervision. Also, in January of 2020, appellant was indicted in Case No. 20 CRI 01 0039 on a new charge of domestic violence in violation of R.C. 2919.25(A), a felony of the third degree based on two prior offenses.

**{¶8}** On February 7, 2020, an Amended Motion to Suspend Community Control Sanctions was filed in the earlier case. The motion alleged that appellant, who had been apprehended in Pennsylvania, had left the State of Ohio without consent and had violated the no-contact order.

**{¶9}** On July 16, 2020, this Court affirmed appellant's conviction in Case No. 18 CR I 11 0683. See *State v. Sanders*, 5th District Delaware No. 2019 CAA 05 0033, 2020-Ohio-3733.

**{¶10}** The offense in case No. 20 CRI 01 0039 was tried to a jury in December of 2020. The following evidence was adduced at trial.

**{¶11}** S.S. testified that she had known appellant since she was ten years old and that they had dated on and off for several years. Appellant and S.S. had one child together and her other child was from another relationship. In addition, S.S. raised two children that appellant had from another relationship as her own. Appellant also had another child with a woman named Angelina.

**{¶12}** In December of 2019, appellant and S.S. were trying to figure things out about their relationship for the children's' sake.  The two wanted to reconcile and to put their family back together. S.S. believed that appellant was seeing Angelina. While

appellant denied that the two were seeing each other, Angelina told S.S. that she and appellant were seeing each other, but were co-parenting their child together.

{¶13} On December 5, 2019, S.S. came home from work and asked appellant if he was going to pick up the two children that she had raised as her own. They went to school around the corner from Angelina's house and went to her house until appellant got off of work. Appellant said that he would pick them up later. S.S. called her brother, who was close to appellant, to come and talk to appellant. She was hoping that her brother could help her figure out whether appellant was "all in" with her or also with Angelina. Trial Transcript at 172. S.S. left the house before her brother arrived at the house and shortly thereafter, appellant's sister, Sharee, called S.S. and asked her what she was doing. S.S. told Sharee that she did not know where she stood with appellant and that things were not going well with them. S.S. then went over to Sharee's house and was there for less than half an hour before the two left to get drinks at a local bar. Sharee ordered   a pitcher of some kind of drink and S.S. "sipped on some of it." Trial Transcript at 173. S.S. told Sharee of her concerns that appellant was "playing both sides" and that appellant was seeing Angelina and lying about it. Trial Transcript at 174.  Based on her conversation with Sharee, S.S. Face Timed Angelina.

{¶14} After talking with Angelina, who insinuated that she was still involved with appellant, S.S. decided to go talk to appellant. She went back to her house where appellant was at along with her kids, a niece and a nephew who were also there. The kids were asleep in their rooms.

{¶15} S.S. spoke with appellant about the state of their relationship. Appellant was playing a video game and S.S. asked him to turn off the microphone so that they could

talk. When he did not do so, she became agitated and unplugged the microphone. S.S. told him that she had talked to Angelina. S.S. told appellant that she was tired of the lies and that if appellant wanted to go with Angelina, she was fine with that. When appellant denied that there was anything going on with Angelina, S.S. told him to pack his things and leave because she had had enough of the lies.

{¶16} Appellant then blew cigarette smoke in S.S.'s face. She snatched the cigarette away and broke off the end and cursed at appellant for being disrespectful. Appellant then called his sister and asked her to come over to ensure that things did not get out of hand while he packed up his stuff to leave. As appellant began gathering up his things, S.S. and appellant began to argue. As their argument became more heated, S.S. told appellant to just leave and that her brother would bring his things to him later. Appellant refused but S.S. insisted that he needed to go. She then walked out of the room.

{¶17} After appellant had not left approximately five minutes later, S.S. walked back into the room and told appellant that she hated him and he was a coward. She told him that she wished that she had never met him. Appellant started laughing and called S.S. pathetic and a clown. S.S. told appellant to call his sister who had not yet arrived and called appellant a "P-U-S-S-Y." Trial Transcript at 190. Appellant then ran over and grabbed S.S's neck with his left hand. The two ended up in the hallway against a banister. Appellant threatened to push S.S. over the banister, so she wrapped her left leg around one of the balusters. Appellant tightened his grip on her neck.

{¶18} Once appellant left, S.S. ran into her bedroom hoping to get her cell phone. She told appellant that she was calling the police, so he needed to leave. S.S. did not see her cell phone and turned to leave her room to search for the same. As she turned towards

appellant, appellant struck her on the head and she fell to the ground. S.S. was not able to see what she was struck with.

{¶19} When S.S. got up, she felt something "leaking" onto her face. Trial Transcript at 199. When she touched her face, she discovered blood on her hands. Because blood makes her dizzy and squeamish, S.S. stumbled backwards onto her bed. S.S. then got up and attempted to walk to the land line phone on her nightstand. Appellant reentered the room at this time, so she told him again that he needed to leave because she was calling the police. Appellant then grabbed her right arm but S.S. pulled away from him. When she dd so, the phone fell behind the nightstand. S.S. was hitting appellant and he then grabbed her again. They fell onto the bed. S.S. passed out and when she came to, appellant was gone. She did not hear appellant run down the stairs which were uncarpeted.

{¶20} When S.S. came to, she went downstairs for her car keys, but they were not there. She assumed that appellant had taken them. When she found her cell phone, she started to call 911, but decided that she did not want the police waking up the children or the children to see her with blood on her face. S.S. decided to walk to the police station which was a few blocks away. While she was walking, appellant's sister Sharee called and they did a video call. Sharee was shocked by S.S.'s appearance and told her that she was bleeding. S.S. told Sharee that she and appellant had been arguing and that appellant had choked her and grabbed her. Sharee told S.S. to stop and that she would come and get her, but S.S. did not want to wait. Sharee then drove past S.S., stopped and ran over to her. S.S., who was crying, told Sharee what had happened and Sharee told her to calm down. Sharee told S.S. that she would take her to the hospital, but S.S.

said that she did not want to go to the hospital but to the police station. When S.S. pulled away from Sharee, she lost her balance and fell onto the ground. S.S. testified that Sharee told her that she had to get up because people were screaming about calling the police.

{¶21} S.S. eventually got into the car with Sharee and had an asthma attack. S.S. told Sharee to take her to her mother's for an inhaler but Sharee refused to go to S.S.'s mother's house but went to S.S.'s sister's house instead. S.S. passed out on the way there. S.S.'s sister would not come to the door, so S.S. had to call her to come down. When she saw S.S., she started yelling about what had happened and they explained it to her. S.S.'s sister said that she should go to the hospital, but S.S. wanted to go to the police station. After her sister asked about the kids, S.S. began to rethink her plan. S.S. was afraid that if she went to the police, she would not get to see appellant's children again, so she asked to go home instead.

{¶22} S.S. testified that she must have passed out again because when she woke up, the police were at the door to her sister's house. She told her sister that she did not want to talk to them and told her to get rid of them. Sharee ended up talking to the police. After the police left, Sharee took S.S. home and S.S. relaxed on the bed.

{¶23} Sharee returned to S.S's home around 7:00 a.m. to take S.S.'s oldest child to school and S.S. got up around 8:00 a.m. to take the younger children to school. S.S. then went to Sharee's house and told her that she was thinking of pressing charges. The two talked for a while and then S.S. went to her brother's house. When she took off the scarf that she was wearing on her head, her brother saw blood and got mad and S.S. explained what had happened. S.S. also spoke with Angelina and told her what had

happened and warned her to be careful. She texted Angelina photos of her injury and blood stained bedding and told her that the police were on the way.

{¶24} After speaking with her family, S.S. decided to call the police. When they came out, they told her that she needed to go to the hospital for stitches. After giving a statement to the police, S.S. went to the hospital for treatment. At the hospital, Sharee began texting S.S. Sharee told her that appellant was having suicidal thoughts. S.S. was worried that appellant might hurt himself and felt pressured to recant her statements to the police. S.S. told the police that she did not want to talk anymore and did not want to press charges. S.S., however, told the emergency room nurse what had happened and that her significant other was her assailant.

{¶25} S.S. was treated at the hospital and when she was released, her whole family knew about the assault and begged her to cooperate with the police. S.S. finally went to the police station and provided a statement and filled out additional paperwork.

{¶26} After obtaining a warrant, the police officer unsuccessfully attempted to contact appellant at various times.

{¶27} At the conclusion of the evidence and the end of deliberations, the jury found appellant guilty of domestic violence. The matter proceeded to sentencing. At sentencing, the trial court first addressed the pending community control violations in Case No. 18 CR I 11 063. Appellee amended the violations to allege that appellant absconded from supervision, had violated the no-contact provision with S.S, and was convicted of the new felony domestic violence. Appellant admitted to the violations and the trial court revoked his community control and sentenced appellant to maximum consecutive terms consisting of the reserved term of eighteen (18) months on the original

fourth-degree felony domestic violence and thirty-six (36) months on the new third degree felony domestic violence for an aggregate prison term of four and a half years.

**{¶28}** Appellant timely appealed the new conviction in Case No. 20CRI010039, which was assigned Case No. 21 CAA 01 0004. He also appealed from the community control violation in Case No. 18CRI110683, which was assigned Case No. 21 CAA 01 0005. The two appeals were consolidated.

**{¶29}** Appellant now raises the following assignments of error on appeal:

**{¶30}** "I. THE CONVICTION FOR DOMESTIC VIOLENCE WAS NOT SUPPORTED BY THE WEIGHT OF THE EVIDENCE."

**{¶31}** "II. APPELLANT'S ADMISSION TO COMMUNITY CONTROL VIOLATIONS DID NOT COMPLY WITH DUE PROCESS BECAUSE THEY WERE NOT ENTERED KNOWINGLY, INTELLIGENTLY, OR VOLUNTARILY."

I

**{¶32}** Appellant, in his first assignment of error, argues that his conviction is against the manifest weight of the evidence. We disagree.

**{¶33}** In determining whether a conviction is against the manifest weight of the evidence, the court of appeals functions as the "thirteenth juror," and after "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be overturned and a new trial ordered." *State v. Thompkins* 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541. Reversing a conviction as being against the manifest weight of the evidence and ordering a new trial should be reserved for only the "exceptional case

in which the evidence weighs heavily against the conviction." *State v. Schoeneman*, 5th Dist. Stark No. 2017CA00049, 2017-Ohio-7472, ¶¶ 21-23.

**{¶34}** We note the weight to be given to the evidence and the credibility of the witnesses are issues for the trier of fact. *State v. DeHass,* 10 Ohio St.2d 230, 237 N.E.2d 212 (1967). The trier of fact "has the best opportunity to view the demeanor, attitude, and credibility of each witness, something that does not translate well on the written page." *Davis v. Flickinger*, 77 Ohio St.3d 415, 418, 1997–Ohio–260, 674 N.E.2d 1159. *State v. Schoeneman,* 5th Dist. Stark No. 2017CA00049, 2017-Ohio-7472, ¶¶ 21-23.

**{¶35}** Appellant, in the case sub judice, was convicted of domestic violence in violation of R.C. 2919.25(A). such section provides that "[n]o person shall knowingly cause or attempt to cause physical harm to a family or household member." "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. R.C. 2901.22 (B). Physical harm means "any injury, illness, or other physiological impairment, regardless of its gravity or duration." R.C. 2901.01(A)(3).

**{¶36}** Appellant specifically argues that he presented three witnesses at trial who testified that he was at his sister's house playing video games until he was called away to Angelina's house where he stayed the rest for the night and, thus, he had no direct interaction with S.S. that night. He further contends that S.S.'s story was not credible because while S.S. testified that the two fought loudly yelling and cursing, the children slept through all of it and no neighbors came to check on them. He also argues that while S.S. claimed that appellant had strangled her, there were no marks or "other objective evidence to prove strangulation."  Appellant also maintains that the injury to S.S's head

is more consistent with the conclusion that she was extremely drunk, hit her head on something and passed out. He notes that Sharee testified that the bartender had to cut them off and that S.S. appeared to have a history with alcohol, having recently completed a driver's intervention program. Finally, appellant asserts that the timing of S.S's complaint to the police was suspicious since she did not make a report until she had time to think about it, be browbeaten by her family into blaming appellant for her injuries, and until she became mad enough at appellant for being with Angelina.

**{¶37}** However, we find that the jury did not lose its way in convicting appellant of domestic violence. The jury, as trier of fact, was in the best position to assess credibility and clearly found S.S's detailed version of events to be credible and did not find the testimony of appellant's witnesses to be credible. We note that S.S. testified that she did not call the police right away because she was fearful that she would be prevented from being in contact with appellant's children who she had helped raise and because she did not want her children to see her with blood on her face. She testified that she was not intoxicated. In addition, Angelina testified that S.S.'s text messages to her during the relevant period of time were coherent. While appellant argues that there was no evidence of him sustaining defensive wounds, after committing the offense, appellant evaded the police and fled the state, resulting in no photos of appellant. Moreover, there was medical testimony that strangulation often does not leave external marks or injuries because the amount of time is so short. The registered nurse who tended to S.S. at the hospital ER testified that their concern was with internal damage and that appellant, who complained of a scratchy throat, difficulty swallowing and clearing her throat, had more than one symptom of the same. Appellant presented at the hospital for a head injury too. The

nurse testified that they did not give appellant stiches for her head injury because too long a period of time had elapsed between the injury and the hospital visit.

{¶38} In short, viewing the evidence in its entirely, we cannot say that the jury committed a manifest miscarriage of justice in convicting appellant of domestic violence.

{¶39} Appellant's first assignment of error is, therefore, overruled.

II

{¶40} Appellant, in his second assignment of error, argues that his admissions to the community control violations did not comply with due process because they were not entered knowingly, intelligently and voluntarily. We disagree.

{¶41} "Although a revocation proceeding must comport with the requirements of due process, it is not a criminal proceeding". *State v. Ryan,* 3rd Dist. Union No. 14–06–55, 2007–Ohio–4743 at paragraph 8, citing *Gagnon v. Scarpelli,* 411 U.S. 778, 782, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973). Therefore, the minimum due process requirements afforded a defendant in a probation revocation proceeding differ from those in a criminal trial. The minimum due process requirements for revocation hearings are as follows:

> Written notice of the claimed violations of [probation or] parole; disclosure to the [probationer or] parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a 'neutral and detached' hearing body such as a traditional parole board, members of which need not be judicial officers or

lawyers; and (f) a written statement by the fact finders as to the evidence relied on and reasons for revoking [probation or] parole.

*State v. Miller,* 42 Ohio St.2d 102, 104, 326 N.E.2d 259 (1975), quoting *Morrissey v. Brewer,* 408 U.S. 471, 489, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).

**{¶42}** Crim.R. 32.3 sets forth the following requirements which must be met prior to the revocation of community control that: (1) "[t]he court shall not impose a prison term for violation of the conditions of a control sanction or revoke probation except after a hearing at which the defendant shall be present and apprised of the grounds on which action is proposed[ ]" and (2) "that the defendant shall have the right to be represented by retained counsel and shall be so advised."

**{¶43}** Appellant was alleged to have violated his community control by violating the no-contact order, absconding from supervision, leaving the State of Ohio without permission, and committing a new felony offense while under supervision in Case No. 18 CRI110683.

**{¶44}** The trial court, on December 31, 2020, stated, in relevant part, on the record:

**{¶45}** THE COURT: Of course when this kind of motion is filed here, Mr. Sanders, you, as the Defendant, have a choice. You could agree that you did violate the terms of your community control sentence in that older case as alleged in the prosecutor's latest motion. I would then decide what to do next in that older case. You are under supervision in that case for one fourth degree felony domestic violence conviction, and there is a reserved prison term of 18 months hanging over you in that one.

**{¶46}** Or today, rather than admitting these allegations, you could deny them. If you want to deny them, you are entitled to have a hearing on them. At that hearing, you could be represented by your attorney. You and your attorney could present whatever evidence you would like to refute these allegations. Your attorney could ask questions of any witness the prosecutor might present, and it would be in the prosecutor's burden to convince me that you have done or failed to do these things that she alleges.

**{¶47}** Any questions about those matters, Mr. Sanders?

**{¶48}** THE DEFENDANT: No, Your Honor.

**{¶49}** THE COURT: All right. Do you know what you would like to do on the probation matter, Mr. Carson?

**{¶50}** MR. CARSON: Yes, Your Honor. Mr. Sanders will admit to the violations.

**{¶51}** Transcript from December 31, 2020 at 4-5. Appellant then admitted to the violations and the trial court found that he had violated his community control.

**{¶52}** We find that appellant's admissions to the community control violations were entered knowingly, intelligently and voluntarily and that there was no due process violation. Appellant, who was advised of his alleged violations, was advised of his right to a hearing and to be represented by counsel at any hearing and chose to forego the same. We find that the trial court complied with Crim.R. 32.3. We note that appellant argues that if his conviction in this case is overturned on appeal, then his admission was not entered knowingly, intelligently and voluntarily. However, as is stated above, appellant's conviction has been sustained by this Court.

**{¶53}** Appellant's second assignment of error is, therefore, overruled.

**{¶54}** Accordingly, the judgment of the Delaware County Court of Common Pleas is affirmed.

By: Baldwin, J.

Hoffman, P.J. and

Delaney, J. concur.